JOHN W. SEYMOUR *et al.*

*v.*

DUNCAN MACKAY *et al.*

*Filed at Ottawa November 15, 1888.*

1. MORTGAGE—*deed absolute in form—mortgagor's interest subject to execution.* Where an absolute deed of land is given as security for money loaned, it will be treated as a mortgage, and the interest of the grantor will be subject to levy and sale under execution against him, while the relation of mortgagor and mortgagee exists.

2. SAME—*vesting entire estate in mortgagee, as cutting off the rights of other creditors.* Where the transaction is fair, and not attended with oppression or fraud or undue influence, and the mortgagee has not availed himself of his position to obtain an advantage over the mortgagor, a *bona fide* agreement between the parties to vest the entire

estate in the mortgagee will be sustained, and the execution of a formal deed will not be required.

3. So where a deed, absolute in form, is given as a security for a debt, and a contract given by the grantee to reconvey, on payment, and the debtor, being unable to pay, surrenders such contract in discharge of the debt, and takes a lease of the premises, he will thereafter have no such interest in the land as will be subject to levy and sale under execution.

4. SAME—*satisfaction entered, through fraud or mistake, etc.—subsequent incumbrancer.* If the entry of satisfaction of a mortgage is procured by fraud, or it is entered by accident or mistake, it may be set aside by a court of equity.

5. But where the owner of the mortgage debt enters satisfaction of the mortgage on the record, under an agreement with the mortgagor, to enable the latter to obtain money with which to make an investment on joint account, and the mortgagor fails to procure the money and make the investment as agreed, the entry of satisfaction will be good in favor of a party holding a subsequent mortgage, who took no part in procuring the entry of satisfaction, and the entry will not be set aside as to him.

6. SAME—*consideration for release.* Where the mortgagee releases his mortgage of record, upon the agreement of the mortgagor to procure a loan of money on the premises, for investment for himself and the mortgagee, on joint account, out of which to pay the mortgage debt, such agreement will be a sufficient consideration to support the contract to release the mortgage, and the release will be as valid and operative as if payment of the mortgage indebtedness had been made.

7. SAME—*ratification of release.* The holder of a mortgage debt, for the purpose of enabling the mortgagor to borrow money for investment on joint account, had the mortgagee enter satisfaction of the mortgage on the record. The mortgagor failed to obtain money and carry out the agreement under which the release of the mortgage was made, and some three years afterward the holder of the mortgage debt, without having taken any steps to set aside the release, had a settlement with the mortgagor, under which he surrendered the old note and mortgage, and took a new note for the sum found due: *Held,* that this was to be regarded as a ratification of the release of the mortgage, and that such mortgage could not be thereafter enforced, to the prejudice of parties having subsequent liens or rights in the property.

8. CONTRACT—*execution in ignorance of its terms—negligence.* Where a party executes a written contract after having full opportunity to read it and study its provisions, and he does read it, and subsequently signs the same, it will be his own fault if he does not understand it, and he will be bound by its terms and provisions.

WRIT OF ERROR to the Appellate Court for the Second District ;—heard in that court on writ of error to the Circuit Court of Carroll county ; the Hon. JOHN V. EUSTACE, Judge, presiding.

This action, as originally commenced, was a bill in equity, brought by Daniel Belding, against Duncan Mackay, to cancel a certain lease, to declare certain deeds to be mortgages, for an accounting, and for general relief. It is, in substance, set up in the bill, that on the 5th day of February, 1870, complainant, Daniel Belding, and his wife, conveyed, by deed to Mackay, a certain tract of land in Carroll county, consisting of about 340 acres ; that the conveyance was intended as a mortgage, to secure the payment of $4000 and interest, money loaned. It is also alleged, that at the same time Mackay executed an agreement to Belding to reconvey upon the payment of $4000 and interest. It is also alleged in the bill, that on February 9, 1872, Belding and wife executed and delivered to Mackay another deed, conveying 120 acres of land in Carroll county, for the expressed consideration of $3800, but the deed was made for securing an indebtedness of only $2000 ; that the land belonged to Harriet Belding, wife of complainant, and it was understood that Mackay should execute an agreement to reconvey the land to Harriet upon the payment of $2000 and interest. It is also set up that this loan was usurious. It is also alleged, that complainant and his wife, on or about April 15, 1874, executed and delivered to Mackay a quitclaim deed for certain lands in Carroll county, for the expressed consideration of $2000, but that no consideration passed ; that the deed was merely made to correct a mistake in the description of the lands in the deed of February 5, 1870. The bill also charges a sale of $92\frac{20}{100}$ acres of the land conveyed to Mackay, to one Alonzo Heath, for $3696, and the receipt by Mackay of the money, to apply on his indebtedness. The bill also alleges a contract between Mackay and Belding, under which Mackay should take all the land south of a certain telegraph road not

taken by Heath, amounting to 132 acres, at $40 per acre, to apply on the indebtedness. It is also alleged in the bill, that in February, 1879, complainant refused to continue to pay Mackay interest at ten per cent on the amount Mackay claimed to be due him, and it was then agreed that in lieu of interest Belding should pay two-fifths of the crops raised on the lands during the season of 1879; that shortly after making the agreement, Mackay presented complainant a paper for his signature, stating that it merely contained their agreement in reference to two-fifths of the products of the farm in lieu of interest; that complainant signed the paper without reading it; that he now finds that the paper was a lease, under which the farm is leased from March 1, 1879, to March 1, 1880, containing provisions of a stringent character. The bill also charges that Mackay now insists that he is the absolute owner of the premises, and wholly denies that complainant has any interest in the lands. The bill prays for an accounting, that the price of the land south of the telegraph road, at $40 per acre, should be credited on the indebtedness, and that the other deeds to Mackay may be decreed to be mortgages.

The defendant, Mackay, put in an answer to the bill, in which he alleges that the deed of February 5, 1870, was executed and delivered to secure a loan of $4000, and future advances; that the deed of February 9, 1872, was executed as security for $3800 additional indebtedness due and owing from Belding to him; denies that he ever agreed to convey the lands therein described to Harriet Belding, upon the payment of $2000 and interest. It is also set up in the answer, that at least once a year, from February 9, 1872, to November, 1876, defendant and complainant had a settlement with each other, and in such settlement interest at ten per cent was computed on the sum found due defendant at the last previous settlement, and whatever he had paid or loaned complainant over the amount paid to and for defendant during the year, was credited to defendant, and also interest at ten per cent; that in

October, 1876, defendant sold complainant the cheese factory erected on said land by defendant, at $2750; that said cheese factory cost defendant $4000; that in November, 1876, they had another settlement of all their financial matters to that time, and which was after defendant sold said cheese factory to complainant, and there was then due defendant $13,750; that they made a written agreement, November 1, 1876, by which defendant agreed to convey to complainant, by special warranty deed, all lands conveyed by complainant and wife to defendant, except the $92\frac{20}{100}$ acres conveyed to said Heath; that this was to be done when complainant paid defendant said $13,750, on or before November 1, 1880, with interest at ten per cent, and all the taxes subsequent to 1875; that by said agreement it was provided, that if complainant failed to make the payments, or any of them, as therein required, said contract, at the option of defendant, might be forfeited, and possession taken by him of said premises. It is also set up in the answer, that the deed of February, 1874, was executed to correct a mistake in the deed of February 5, 1870. The defendant admits that he received $3696 from Heath for the 92 acres sold, and accounted to Belding for the amount in their settlements; that he never agreed to take, at $40 per acre, the balance of the land south of the telegraph road not taken by Heath. The defendant also sets up that the agreement of November 1, 1876, superseded and cancelled all prior agreements for the conveyance of lands; that since said agreement Belding has paid Mackay nothing, but has been in the full receipt of the rents and profits of the lands. It is also set up in the answer, that in the fall of 1878 complainant notified defendant that he was unable to pay anything, and offered to surrender the land and the contract for a deed; that defendant accepted the offer; that the contract of November 1, 1876, was delivered up to the defendant; that the complainant, after the surrender of the contract, expressed a desire to lease the lands, and pay as rent two-fifths of the products; that defendant assented to

this request, and prepared a lease, which was read, and somewhat modified, and approved, and the premises were leased from March 1, 1879, to March 1, 1880; that the lease was executed by complainant with a full knowledge of its contents.

About the time the bill in this case was filed, Belding executed a judgment note, payable to John W. Seymour, for $6164, dated February 1, 1877. Judgment was confessed on the note January 26, 1880, for $7658.86, and on February 3 an execution issued, and was levied on Belding's interest in the lands. On the 12th day of May, 1880, complainant amended his bill, and made John W. Seymour a party defendant. The amendment contains the following allegation: That "Seymour has, or claims to have, some judgment or other lien on the whole of the premises, and an equitable interest therein." Seymour answered the bill, admitting substantially all the material allegations therein, and on May 23, 1880, filed a cross-bill. The cross-bill is quite voluminous. It refers to the original bill and its different provisions, and re-alleges its main allegations. At the same time it contains special grounds upon which relief is predicated. Those grounds are in substance as follows: That on the 16th day of December, 1867, Seymour loaned Belding $3700, for five years, with interest at ten per cent per annum; that in order to secure the payment of the money loaned, Belding executed his note, payable to Helen M. Seymour, wife of complainant, John W. Seymour, and also a mortgage, executed by himself and wife, on the south-west quarter of section 30, township 24, range 6, east, and the north-west quarter of section 31, same town and range, all in Carroll county; that the mortgage was recorded August 30, 1871. It is also alleged, that on or about the 10th day of October, 1871, Helen M. Seymour, at the request of her father, Daniel Belding, went to Mount Carroll, and cancelled of record the mortgage. It is alleged as an excuse for the release of the mortgage, that about the 1st day of October, 1871, Belding, with the assistance of Mackay, had made application to the Northwestern

Life Insurance Company of Milwaukee for a loan of money sufficient to discharge all liens on the lands ; that Mackay had signed a certificate that the lands were worth $75 per acre; that Helen M. Seymour was then and there informed by said Belding and said Mackay that it would be necessary to cancel the record of said trust. deed which she held; that, believing said Mackay was acting in good faith in making said statement, and intended to aid said Belding, her father, in obtaining said money of said insurance company, and was going to settle with said Belding, she, at the request of her father, said Belding, October 10, 1871, receipted on the margin of the record of said trust deed full satisfaction of the mortgage ; that no money was actually paid her, or any one else, on the sum secured by the mortgage; that the cancellation was made without consideration, but was made solely to enable Belding to obtain the money from the insurance company. It is also alleged, that after the mortgage was cancelled, Mackay persuaded Belding not to borrow money of the insurance company; that Mackay, in his attempt to assist Belding, did so solely to get the mortgage held by Helen M. Seymour removed from the record, to enable him to obtain the farm without advancing money above what he had already loaned.

The cross-bill contains many other allegations, but it will not be necessary to set them out here. The prayer is, that Belding and Mackay shall come to an accounting with each other and with Seymour, that the lands in the Helen M. Seymour mortgage be declared subject to the trusts therein declared, that the cancellation of the mortgage be declared void, and that the lands be sold in satisfaction of the mortgage. Mackay, in his answer, set up that he never had any knowledge of the existence of the Helen M. Seymour mortgage until the filing of the cross-bill, or that Seymour or his wife claimed any lien on part of the lands ; denies that he hindered or prevented Belding from borrowing money of the insurance company; denies that he ever made a certificate that the lands

O

were worth $75 per acre.   Indeed, he denies all the material
allegations of the cross-bill.   The court, on the hearing, dis-
missed the cross-bill.

Messrs. W. & W. D. BARGE, for the plaintiffs in error:

Courts of equity will grant relief upon the ground of fraud,
established by presumptive evidence.   *Chesterfield* v. *Janssen*,
2 Ves. 125; *Fullager* v. *Clark*, 18 id. 483; 1 Story's Eq. Jur.
(5th ed.) sec. 190.

Fraud will be presumed, in equity, from the circumstances
of the parties.   *Ward* v. *Lamberth*, 31 Ga. 150; *Gallatian* v.
*Cunningham*, 8 Cow. 361.

The borrower is not on an equality with the lender of money.
The former is generally controlled by a necessity that places
him within the power of the latter.   *Hewitt* v. *Dement*, 57 Ill.
500.

Fraud will be presumed when the parties to a transaction
do not stand upon an equal footing.   Kerr on Fraud and Mis-
take, 143; Story's Eq. Jur. sec. 222; *Edwards* v. *Myrick*, 2
Kan. 68; *Casborne* v. *Barsham*, 2 Beav. 76.

Great distress of mind and a proffer of assistance are cir-
cumstances that may be considered in determining whether a
transaction is fraudulent.   *Dismakes* v. *Terry*, Walker, 197;
*Wilson* v. *Watts*, 9 Md. 356.

Where there is the appearance of fraud, from the nature of
the transaction or the situation of the parties, the burden of
showing that the transaction is free from fraud, is upon the
party who seeks to uphold it.   Kerr on Fraud and Mistake,
(Am. ed.) 385, 386; *Watt* v. *Grove*, 2 S. & L. 502; *Insurance
Co.* v. *Palmer*, 25 Beav. 605; *Cooke* v. *Lamotte*, 15 id. 240;
*Ray* v. *Smith*, 7 H. L. 750.

Through the misconduct of Mackay, Seymour has been
illegally deprived of his security, which was a lien on the land
prior to all liens held by Mackay subsequent to the $4000

loan of February 5, 1870. From this wrong a court of equity will relieve him. And here, the general rule is, that particular persons in contracts and other acts shall not only transact *bona fide* between themselves, but shall not transact *mala fide* in respect to other persons who stand in such a relation to either as to be affected by the contract or the consequences of it. 1 Story's Eq. Jur. (5th ed.) sec. 333; 2 Parsons on Contracts, (2d ed.) sec. 268; *Chesterfield* v. *Janssen*, 2 Ves. 125.

The prayer of the cross-bill should therefore have been granted, the security for the $3700 restored to J. W. Seymour, and the lands therein described subjected to the payment of his debts.

Mr. E. P. Barton, and Mr. J. M. Hunter, for the defendants in error:

The parties to a mortgage may, by a subsequent agreement fairly made, voluntarily cancel the defeasance, and thereby give to the deed the effect of an original absolute conveyance. *Reed* v. *West*, 55 Ill. 242; *Carpenter* v. *Carpenter*, 70 id. 457; 2 Washburn on Real Prop. (3d ed.) 167; 2 Jones on Mortgages, sec. 977.

The Seymour mortgage was released in consideration of Belding's promise to raise money and pay a portion of the mortgage debt, and he was unable to fulfill his promise. But this failure did not revive the mortgage.

If the release did not effectually cancel the mortgage, it was completely done by Seymour in 1874, by settling with Belding and taking a new note for the sum due on the mortgage, and the surrender of the old note and mortgage. This was a ratification of the release. 2 Jones on Mortgages, sec. 926.

The *laches* of Seymour is such as to bar his claim. *Cunningham* v. *Fithian*, 2 Gilm. 650; *Cox* v. *Montgomery*, 36 Ill. 397; 43 id. 110; *Brink* v. *Steadman*, 70 id. 241; *Breit* v. *Yeaton*, 101 id. 242.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the Court:

On the final hearing, upon the pleadings and evidence, the circuit court dismissed the original bill of Belding, and also the cross-bill of Seymour. A writ of error was sued out in the Appellate Court by Seymour, where the decree of the circuit court was affirmed. To reverse that judgment, Seymour has sued out this writ of error.

As the complainant in the original bill (Belding) is not before the court, and is not complaining, it will not be necessary to enter upon a consideration of the matters involved in the original bill, except so far as may be necessary to a proper and legitimate determination of the matters involved in the cross-bill.

The different transactions between Mackay and Belding, wherein money was advanced and a deed taken, may be regarded as mortgages. Indeed, there is no controversy between the parties in regard to the fact that the deeds executed and delivered by Belding and wife to Mackay were given as security for money loaned, and were in fact mortgages. If, therefore, Seymour had obtained a judgment and a levy on the lands while this relation existed between Belding and Mackay, doubtless, if anything had been left after the payment of Mackay's claims, which were prior liens, such assets might properly have been reached by Seymour in satisfaction of his judgment. But it will be observed that Mackay, in his answer, sets up, that as often as once in each year after February 9, 1872, he and Belding had an accounting together; that on the 1st day of November, 1876, they had a full and complete accounting, and on such accounting Belding was found to be indebted to him in the sum of $13,750; that they then executed, in duplicate, a contract, under which, in case Belding paid said sum, with interest at ten per cent per annum, on or before a certain date, Mackay was to convey to Belding all the lands Belding had conveyed to him, except those deeded to Heath. It is

also set up, that after the accounting Belding paid nothing, but in the fall of 1878 offered to surrender the lands and his contract; that Mackay accepted the offer, and the contract held by Belding for a conveyance of the lands was surrendered, and that Belding accepted a lease of the lands, under which he agreed to occupy the same until the 1st of March, 1880, and pay as rent two-fifths of the crops raised.

The contract of November 1, 1876, and the lease, were put in evidence, and, so far as appears, they were fairly and deliberately made by the parties. They speak for themselves, and the rights and obligations of the two contracting parties must be determined by them. It is true that Belding claims, in his evidence, that he was to have $1500 if he surrendered the contract and his interest in the lands, but in this he is not supported by any other evidence in the record.

As to the lease, it is claimed that he did not understand its terms and conditions. The lease was not, however, executed until he had full opportunity to read it and study its provisions. No haste or undue activity was resorted to for the purpose of procuring its execution, but it was left in the custody of a third party, for Belding to examine and execute. He called on that party, read the lease, and went away, and on a subsequent day returned and deliberately executed it. Where a contract is executed under such circumstances, it is the party's own fault if he did not understand it, and he will be bound by its terms and conditions. If, therefore, the rights of Belding and Mackay were settled by the contract of November 1, 1876, and the agreement under which it was surrendered and a lease executed, it is plain that at the time Seymour obtained his judgment there was no title in the lands resting in Belding upon which the judgment could become a lien. Conceding that in the fall of 1878 the relation existing between Belding and Mackay was that of mortgagor and mortgagee, as Mackay held the legal title, and Belding but an equity, the relation of mortgagor and mortgagee might be terminated by a surren-

der of the contract providing for a conveyance, held by Belding, and the acceptance of a lease.   Where the transaction was fair, and not attended with oppression or fraud or undue influence, and the mortgagee has not availed himself of his position to obtain an advantage over the mortgagor, a *bona fide* agreement between the parties to vest the entire estate in the mortgagee will be sustained, and the execution of a formal deed will not be required.   *West* v. *Reed*, 55 Ill. 242; *Carpenter* v. *Carpenter*, 70 id. 457; *Harrison* v. *Trustees of Philips Academy*, 12 Mass. 456; 2 Washburn on Real Prop. (3d ed.) 67; 2 Jones on Mortgages, sec. 977.

This disposes of the case so far as Seymour may claim relief under the judgment he obtained on the 26th day of January, 1880, and the next question to be considered is, whether the release of the mortgage given by Belding and wife to Helen M. Seymour, in 1867, which was entered upon the record by Helen M. Seymour. October 10, 1871, operated as a release of the lands from that mortgage.   If it did, of course no decree could be rendered foreclosing the mortgage.

Section 8, chapter 95, of our statute, provides, that upon payment of a mortgage the mortgagee shall enter satisfaction upon the margin of the record of such mortgage, in the recorder's office, which shall forever thereafter discharge and release the same, and shall bar all actions or suits brought, or to be brought, thereon.   Here the release was made in due form.   It was done with the knowledge and approbation of Seymour, who owned the mortgage indebtedness, by his wife, in whose name the mortgage was taken.   If the release had been procured by fraud, or if the evidence established that the mortgage was released by accident or mistake, there might be ground for setting it aside; but the evidence fails entirely to establish a case of fraud, accident or mistake.   The arrangement, whatever it may have been, which led to the release, was made between Belding and Seymour.   Mackay had nothing to do with it.   Indeed, he did not know at the time that

the Seymour mortgage existed. He had two abstracts of title to the land, neither of which showed the Seymour mortgage.

Seymour, in his evidence, in speaking of the release, said: "I knew of the releasing of this trust deed at the time it was done. It was arranged between Belding and myself that the trust deed should be released, for the purpose of allowing him to raise the money to carry out his agreement with me to purchase cattle, in which I was to have an interest or partnership in lieu of the amount secured by the trust deed, but as Belding failed to carry out his agreement to give me an interest in the cattle, neither my wife nor myself received any consideration for releasing the trust deed."

Belding gives the following account of the release: "The reason she (Helen Seymour) cancelled it (the mortgage) was, some time in the fall Seymour wanted to go into the cattle business, and we wanted money to buy them. We found we could get the money from the Northwestern Life Insurance Company. The company required an abstract of title to the land, and certificate of two or three men of its value. I got a certificate from Duncan Mackay, putting the value of the land at $75 an acre, and got another one of J. F. Allison, putting it at $65 an acre. Allison made an abstract. The trust deed was cancelled to raise money to pay off Duncan Mackay, and money to buy the cattle. I was to furnish the money, Seymour to have half the cattle when fattened and sold. I did not obtain the money of the insurance company. A short time after that, Mackay came to my house and stayed all night. When I lit him up to bed, he said he thought it was foolish for me to borrow the money of a foreign company when I could just as well get it near home at just as good rates. He said he could let me have the money to buy all the cattle I needed on the farm. That is the reason I did not get the money of the insurance company."

It is not claimed that Belding was guilty of any fraud or deception which led to the release of the mortgage. The sub-

23—126 ILL.

stance of the arrangement seems to have been this: that the release was made to enable Belding to raise money with which he and Seymour expected to engage in the cattle business; but after the release had been made, it turned out that Belding failed to raise the money. But the failure of Belding to raise the money could not instil life and vitality into a mortgage which had been cancelled of record. The statute says that where a mortgagee has received full satisfaction and payment of all such sum or sums of money as are really due, he shall enter satisfaction upon the margin of the record, which shall forever discharge and release the same, and shall bar all actions brought thereupon. This mortgage was not paid with money, but upon a consideration agreed upon which was valuable to the parties. No fraud or deception being practiced, it was cancelled and released of record. No reason is perceived why a release made under such circumstances may not be as valid and binding, and be treated in the same way, as a release where the mortgage debt has been paid. The mortgagee may accept less than the full amount in payment of the mortgage, and enter a valid release. If he may accept less than the full amount due, he may agree to release for some other good and valuable consideration, and a release entered of record upon such a consideration ought to be binding on the parties, and operate in the same way as if full payment had been made. The agreement made by Belding with Seymour to furnish the necessary funds and engage in the cattle business, made in good faith, as it was, may be regarded as a sufficient consideration to support the contract of Seymour to release the mortgage.

Again, after it turned out that Belding was not able to raise the amount of money which it was anticipated he would, no effort was made by Seymour to avoid or set aside the release, but, on the other hand, in 1874,—three years after the mortgage had been released, and long after Belding had failed to furnish the money agreed upon, and after the arrangement to enter into the cattle business had been abandoned,—Seymour

made a settlement with Belding, figured up the amount that was due on the old mortgage indebtedness, and took a new note for the balance due, surrendering the old note and mortgage. Now, while it may be conceded that the giving of a new note for an old one does not necessarily pay the old debt, yet in this case we are of opinion that the surrender of the old note and mortgage, and accepting a new note therefor, with the knowledge that the mortgage had been released of record, for three years, may be regarded as a ratification of the release on the part of Seymour.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE BAKER took no part in the consideration of this case in this court, he having passed upon the case in the Appellate Court.