# GOULD ET AL. v. McKILLIP ET AL.

(No. 2134; February 13, 1940; 99 Pac. (2d) 67)

For the appellants, there were briefs and oral argument by *S. K. Briggs* of Rawlins.

For the respondents, there was a brief and oral argument by *D. R. Higley* of Rawlins.

RINER, Chief Justice.

This is a proceeding by direct appeal asking the review of a judgment of the district court of Carbon County, the assigned error which requires consideration in this court being that said judgment "is not sustained by sufficient evidence" and "is contrary to law." The litigation was commenced in the court below through the filing there of a petition by the plaintiff Gould, for the recovery of a particularly described portion of Lot 7 in Block 27 of the Saratoga Real Estate and Improvement Company's First Addition to the Town of Saratoga, in the County aforesaid, and also damages for the withholding of these premises. M. B. McKillip and Alma M. McKillip, husband and wife, were named as defendants. They filed an answer to this pleading, in form a general denial, and incorporated in their answer additionally a cross-petition requesting certain relief in view of the allegations contained therein, based in large measure upon the facts hereinafter to be reviewed. Subsequently and to obtain a complete determination of the entire controversy, the said defendants made an application to the court to have C. W. Jeffrey and C. A. Brimmer also made parties defendant, and this was done. The two parties last mentioned, who were thus brought into the case, filed their joint and several answer to the cross-petition of the McKillips, and plaintiff filed a general denial answer to said cross-petition. The reply on the part of the McKillips put in issue the allegations of new matter set forth in the answer of Jeffrey and Brimmer.

The cause was tried by the court without a jury, and a general finding was made against the plaintiff, upon his petition, and against the defendants Jeffrey and Brimmer on their answer aforesaid, and in favor of the McKillips on their cross-petition. Certain specific findings of fact were also made, among which was that the plaintiff Gould acquired from the defendant Brimmer the property described in plaintiff's petition with

knowledge that the said property was claimed by the McKillips and with knowledge that Brimmer's title to the property was only for security; that the McKillips' equity of redemption had never been extinguished and that their indebtedness to Jeffrey had been paid. Upon these general and specific findings judgment was entered awarding the McKillips the recovery of the sum of $1,077.80, with interest to January 25, 1939, at seven per cent, or a total of $1,253.77, against the defendant Jeffrey, after deducting $74.28 for expenditures made by him on certain of the properties subsequently described herein, together with costs; adjudging that C. A. Brimmer had no "right, title, equity or interest" in the properties hereinafter designated as items (a) and (c), and that the plaintiff Gould had no interest in parcel (c) by virtue of the warranty deed dated May 8, 1937, from Brimmer and wife to Gould, which was by the judgment cancelled; that the warranty deeds dated March 30, 1931, and the quitclaim deed dated December 8, 1934, given Brimmer by the McKillips, all of which will be presently mentioned, were given as security only, and that Brimmer should deliver a quitclaim deed to the McKillips transferring to them items (a) and (c) aforesaid, and in default of his doing so the judgment should operate as such conveyance. The plaintiff Gould and the defendants Jeffrey and Brimmer have become the appellants here.

Those facts presented by this record concerning which there appears to be little, if any, dispute may be thus set forth. On or about March 30, 1931, M. B. McKillip and Alma M. McKillip borrowed from C. W. Jeffrey the sum of $2500.00. Evidenced by a promissory note due one year from date, with interest at eight per cent per annum, the loan being handled and secured at his instance in this manner, viz., the entire transaction was conducted in the name of C. A. Brimmer and the loan aforesaid was secured by the execu-

tion and delivery by the McKillips to him of three warranty deeds, also dated March 30, 1931, which conveyed to Brimmer four specifically described parcels of real estate, which may roughly be designated at this time as: (a) the lot located near the Saratoga, Wyoming, Hot Springs Bath House; (b) the West Half of Lot 6 in Block 1 of Hugus & Chatterton's First Addition to the Town of Saratoga, Wyoming; (c) a portion of Lot 7 in Block 27 of the Saratoga Real Estate and Improvement Company's First Addition to the Town of Saratoga; and, (d) all of Lot 1 in Block 22 of the Addition to the Town of Saratoga last above mentioned. Of even date with these conveyances Brimmer also executed three quitclaim deeds to said real estate running to Alma M. McKillip, who apparently held the record title to said properties. An escrow agreement was drawn and signed by Brimmer as party of the first part and Mrs. McKillip as the second party, likewise dated March 30, 1931. This escrow agreement contained, among other provisions and recitals, the following:

"WHEREAS, the said party of the first part has this day advanced and loaned to the said Alma M. McKillip, party of the second part herein, the sum of Twenty-five Hundred and no/100 ($2500.00) Dollars on a promissory note, bearing even date herewith, and for a period of one (1) year with interest at eight (8) per cent, per annum, payable semi-annually, * * * * * *

"NOW, THEREFORE, it is agreed by and between the parties hereto that the said deeds hereinabove mentioned running from the said party of the first part to the said party of the second part shall be held by The First National Bank of Rawlins, Wyoming, in escrow, to be disposed of as follows:

"1. That the said party of the second part may at any time within one (1) year from date hereof pay to The First National Bank of Rawlins, Wyoming, the sum of Twenty-five Hundred and No/100 ($2500.00) Dollars, with interest at eight (8) per cent per annum from date hereof for the credit of the said party of the

first part, at which time the said bank shall deliver to the said party of the second part the deeds held by the said bank, hereinabove referred to.

"2. It is understood and agreed by and between the parties hereto that the party of the second part has granted an option and intends to sell and dispose of a part of the said real property herein referred to prior to the maturity of the said note. That in the event that the said sale or sales materialize it is understood and agreed by and between the parties hereto that the said sales shall be made by and with the consent of the party of the first part, and that any moneys paid or received by the party of the second part, on account of the said sale, shall be applied upon the note and indebtedness owing to the party of the first part, and thereupon the party of the first part shall release the lots and real estate so sold.

\* \* \* \* \* \*

"It is further understood and agreed by and between the parties hereto that the said party of the second part herein shall have the care and custody of said property hereinafter described and collect and retain the rents therefrom during the period of this contract."

This escrow agreement also provided that in the event Mrs. McKillip failed to repay the loan aforesaid on or before March 30, 1932, thirty days grace thereafter being also allowed, the said bank should return the three quitclaim deeds mentioned above to Brimmer and "all equities and demands of said party of the second part" in and to said properties should "cease and determine."

The McKillips failed to repay, as stipulated in said agreement, the indebtedness above described, although repeated efforts were made by Brimmer to get them to do so, and the matter ran along in that condition until September 17, 1932, when Brimmer demanded and obtained from the Bank aforesaid the three quitclaim deeds deposited with that institution, and under that date wrote a letter to the McKillips, addressed to them at Saratoga, Wyoming, informing them of this fact,

returning to them the promissory note hereinbefore mentioned, and advising them that he claimed "to be the owner of the property and will not recognize that you have any right, title or claim to said property." From then and for some time thereafter the rents from several of these properties were paid to Brimmer for Jeffrey, in the sum of $924.00, and the latter paid taxes on the properties and expended several additional sums for repairs. During the following years of 1933 and 1934 M. B. McKillip wrote several letters to Brimmer which indicated that McKillip was still endeavoring to sell some of the properties to repay the indebtedness aforesaid and referring especially to the value of the properties involved being largely over and above the amount of the loan made thereon.

On January 17, 1935, Jeffrey received the sum of $2500.00 on account of a sale made by him and Brimmer to one Donelan of item (b) supra, and on April 26, 1935, the sum of $1,000.00, and thereafter, on August 19, 1935, $500.00, or a total of $1,500.00 on account of the sale of item (d) to one Fryer. On May 8, 1937, item (c), supra, was undertaken to be sold by warranty deed from Brimmer and wife to the plaintiff Gould.

We now come to that important part of the record evidence in the case which presents some conflict. On or about December 4, 1934, while negotiations were in progress for the sale by Jeffrey and Brimmer to Donelan, as already related, of one of the pieces of real estate (item (b)) and another parcel (item (d)) to Fryer, according to the testimony of Brimmer and one Corpening, the latter, with McKillip and Donelan, came to Brimmer's office in Rawlins, Wyoming, and it was there orally agreed that if the McKillips would execute and convey to Brimmer by quitclaim deed the title to the four parcels of property aforesaid, that Brimmer would "give the McKillips an option to pur-

chase the office property (item (c) supra) for three hundred fifty dollars"; that this arrangement was made because Brimmer did not care to sign warranty deeds until this proposed quitclaim deed was given to him by the McKillips (the intending purchasers, Donelan and Fryer, of the two parcels aforesaid, insisting upon warranty deeds), in view of Mrs. McKillip claiming "some rights" in the property, although he (Brimmer) denied that she then had any interest therein; that Brimmer prepared the quitclaim deed and sent it to Corpening, an attorney at law at Saratoga, Wyoming, where it was presented by Donelan and Corpening to and signed by both the McKillips on December 8, 1934. Before she signed this instrument Mrs. McKillip inserted what she considered a corrective description of one of the parcels of real estate affected. The quitclaim deed was then returned to Mr. Brimmer.

In view of the general finding in favor of the McKillips made by the trial court, who saw and heard the witnesses, the version of the McKillips concerning the claimed arrangement made December 4, 1934, and above described, and what occurred at the time the quitclaim deed of December 8, 1934, was presented to them for their signature and which is of vital importance here, is as follows: Mrs. McKillip testified in substance that Donelan and Corpening came to the McKillips and said, "If you give us this quitclaim deed we think we can save the rights on the property"; that the McKillips were also told by these men that Jeffrey would not give a warranty deed unless they obtained this quitclaim deed from her and her husband; that she understood the quitclaim instrument was "to clear the title on the corner" (apparently the item (b) supra); that she did not hear that her rights to the properties had been cut off, that whenever she spoke to Mr. McKillip about it he would get excited and tell her nothing; that she learned about her right to get

her property back about the time Donelan was buying item (b) supra; that she claimed the right to items (a), (c) and (d) supra; that she considered that the sale of item (b) aforesaid, with the rentals received by Brimmer and Jeffrey, had paid the debt owed by the McKillips to Jeffrey; that she has been living on parcel (c), aforesaid, since 1933; that her husband's health has been very bad since 1933; that he has had convulsions and had such spells off and on down to the time the trial took place in Rawlins, Wyoming, on December 4, 1937; that she is sixty-nine years old and her husband is seventy-four years old; that she thought it was all right to sign the quitclaim deed if "we could save some of the property"; that Donelan and Corpening told her that if she executed the aforesaid quitclaim deed perhaps they could get some of the McKillips' properties back for them. On cross-examination she further stated that Corpening never told her that Jeffrey would give her the right to buy item (c) for $350.00; that he may have told her husband that.

M. B. McKillip testified among other things that he was seventy-four years old; that the money was borrowed from Brimmer; that he did not see Jeffrey; that he did not object to the sale of the parcels of property to Donelan and to Fryer; that he supposed he had given a mortgage on the properties aforesaid; that as far as he is concerned his wife owns items (a) and (c) above mentioned; that he signed the quitclaim deed because "Mr. Corpening came in there as an attorney for Mr. Brimmer, and I was very ill, and I didn't want to sign it, and he made the statement that if I would sign that deed and clear the matter up so that they could make a legal transfer to Fryer and Donelan that it would clear the rest of the property, and I signed it"; that he still lives on parcel (c) supra; that he got nothing from Donelan and Corpening for signing the quitclaim deed other than the statement by them that

if he did sign it would clear up "the other property." On cross-examination he also stated that he had no recollection of coming to Rawlins with Donelan and Corpening to see Brimmer prior to December 8, 1934; that he was then ill and had been so for a week. He gave other testimony which indicated that his mind was not at all clear in regard to the transactions involved in several respects.

No question appears to be made by the parties as to the accuracy of the amount found to be due the McKillips as fixed by the judgment aforesaid. There also seems to be no criticism here of the view taken by the trial court that the original transaction of March 30, 1931, was merely an equitable mortgage. That it was such we have little doubt. In 3 Pomeroy's Equity Jurisprudence (4th Ed.) Sec. 1193, Page 2826, upon the strength of many cited decisions of appellate courts, the author in text and footnote states that:

"The doctrine has been firmly established from an early day that when the character of a mortgage has attached at the commencement of the transaction, so that the instrument, whatever be its form, is regarded in equity as a mortgage, that character of mortgage must and will always continue. If the instrument is in its essence a mortgage, the parties cannot by any stipulations, however express and positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity. The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and encumbrance of the mortgage; the equitable right of redemption after a default is preserved, remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction purporting to cut off this right.

"This doctrine is based upon the relative situation of the debtor and the creditor; it recognizes the fact that the creditor necessarily has a power over his debtor which may be exercised inequitably; that the debtor is liable to yield to the exertion of such power; and it protects the debtor absolutely from the consequences of his inferiority, and of his own acts done through infirmity of will. The doctrine is universal in its application, and underlies many special rules of equity. It extends to stipulations limiting the time of redemption, or the parties who may redeem; notwithstanding all such stipulations, the right to redeem is general."

And in Section 1195, Pages 2834-2836, of the same text, the learned author also says:

"Whether any particular transaction does thus amount to a mortgage or to a sale with a contract of repurchase must, to a large extent, depend upon its own special circumstances; for the question finally turns, in all cases, upon the real intention of the parties as shown upon the face of the writings, or as disclosed by extrinsic evidence. A general criterion, however, has been established by an overwhelming consensus of authorities, which furnishes a sufficient test in the great majority of cases; and whenever the application of this test still leaves a doubt, the American courts, from obvious motives of policy, have generally leaned in favor of the mortgage. This criterion is the continued existence of a debt or liability between the parties, so that the conveyance is in reality intended as a security for the debt or indemnity against the liability. If there is an indebtedness or liability between the parties, either a debt existing prior to the conveyance, or a debt arising from a loan made at the time of the conveyance, or from any other cause, and this debt is still left subsisting, not being discharged or satisfied by the conveyance, but the grantor is regarded as still owing and bound to pay it at some future time, so that the payment stipulated for in the agreement to reconvey is in reality the payment of this existing debt, then the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instruments."

It is earnestly contended, however, that the McKillips' right of redemption to any of the properties aforesaid was cut off by the subsequent oral arrangement asserted to have been made between Brimmer and McKillip on or about December 4, 1934, followed by the execution of the quitclaim deed dated December 8, 1934, on the part of both Mr. and Mrs. McKillip. Speaking of a deed originally "intended as a mortgage," 1 Jones on Mortgages (8th Ed.) Sec. 414, Pages 528-529, says:

"The maxim, 'once a mortgage always a mortgage,' applies to such a deed; and if a purchaser take a conveyance from the grantee, with a knowledge that the grantor claims an interest in the property, he takes it charged with the same equities with which it was charged in the hands of the mortgagee. But this maxim was never intended, and has never been construed, to prevent a mortgagee, by subsequent contract, from purchasing the equity of redemption, or from obtaining a release of it, for an adequate consideration.

"The mortgagor may make a subsequent release of the equity of redemption, but an adequate consideration is necessary to support it. It must be for a consideration that would be deemed reasonable if the transaction were between other parties. The transaction must in all respects be fair, with no unconscientious advantage taken by the mortgagee. Such a release will not be inferred from equivocal circumstances and loose expressions. It must appear by a writing importing in terms a transfer of the mortgagor's interest, or such facts must be shown as will estop him afterward to assert any interest. In determining whether an instrument of uncertain import in itself was intended to operate as a release, the fact that the value of the property was at the time greatly in excess of the amount then paid, and of that originally secured, and the fact that the mortgagor retained possession of the land and cultivated it, are strong evidence tending to show that a release was not intended.

"A mere agreement of sale between the parties executed long after the deed intended as a mortgage,

without any new consideration, does not alter the character of the original transaction."

In Bowen et al. v. First State Bank, 69 Mont. 223, 221 P. 527, the court remarks:

" 'The maxim "once a mortgage, always a mortgage" does not prohibit the mortgagor from selling or releasing his equity of redemption to the mortgagee by a separate and distinct contract entered into in good faith and for a good consideration.' 19 R. C. L. 386. A release or conveyance of the mortgagor's interest in the mortgaged land, made subsequent to the mortgage, after a default in complying with a condition thereof, will be sustained, if supported by a sufficient consideration, and where there is no showing of fraud, oppression, or undue advantage. Watson v. Edwards, 105 Cal, 70, 38 Pac. 527; Seymour v. Mackay, 126 Ill. 341, 352, 18 N. E. 552. See, also, extended note to Bradbury v. Davenport, 114 Cal. 593, 46 Pac. 1062, in 55 Am. St. Rep. 92.

"Transactions of this nature should be carefully scrutinized, but a diligent consideration of all the dealings between the bank and Mason, which culminated in the execution of the deed on December 5, 1918, fails to disclose that any fraud or oppression was practiced upon, or undue advantage taken of, him in connection therewith. The value of the land conveyed to the bank in satisfaction of the debt discharged by the conveyance did not exceed the amount thereof."

In Haynes v. Rosenfield, 99 Okla. 158, 225 P. 975, the court, quoting from a note appended at page 105 of 55 American State Reports to the case of Bradbury v. Davenport, 114 Cal. 593, 46 P. 1062, 55 Am. St. Rep. 92, uses this language:

" 'The doctrine, 'once a mortgage, always a mortgage,' does not, however, refer to a future contract between the mortgagor and mortgagee in respect to the estate between the parties, and the mortgagee may always purchase the mortgagor's right of redemption, and thus acquire an absolute title. Hence, a subsequent release or waiver of the equity of redemp-

tion will be sustained, if supported by a sufficient consideration, in the absence of fraud, oppression and undue advantage."

Many authorities are cited as supporting this note. We think no useful purpose would be accomplished by citation of additions to the authorities quoted there, though that could easily be done.

When applied to the situation presented by the record before us the principles they announce would appear to negative any duty of this court to interfere with the judgment in question. Inasmuch as the evidence on the subject was in conflict we must take it, under the general finding in their favor, that, as alleged in the McKillips' cross-petition, the trial court decided that there was no consideration for the quitclaim deed of date December 8, 1934; that it was merely given as security and in aid of the original arrangement as embodied in the escrow agreement described above, i. e., for the purpose of enabling Jeffrey and Brimmer to sell enough of the properties owned by Mrs. McKillip to pay off the indebtedness justly due to Jeffrey; that when that was done the remaining properties should be returned to the McKillips. It will be recalled that Mrs. McKillip testified she knew nothing of any arrangement to repurchase item (c) of the properties, as claimed by Brimmer, notwithstanding she was the record owner of all the properties. When to the testimony given by the McKillips is added the significant fact that the value of the properties conveyed (plus the rentals thereon received by Jeffrey and Brimmer therefor) as security to Brimmer, was, as shown by the actual sales made as described above, far in excess of the debt secured, we are quite unable to say that the trial court's judgment was unsupported by substantial evidence or contrary to law.

Finally, it is alleged that the McKillips are guilty of laches in asserting their right to redeem the property.

We are unable to favor this contention under the circumstances here presented. Ordinarily the right to foreclose a mortgage and the right to redeem therefrom are reciprocal. 2 Jones on Mortgages (8th Ed.) Section 1467, Page 958; Leland v. Morrison, 92 S. C. 501-514, 75 S. E. 889, Ann. Cas. 1914B 349. When one is barred the other is also. It is familiar law that the statute of limitations is frequently regarded as supplying a guide to the courts to enable them to determine what should be regarded as laches and what should not. If that principle were applied here obviously there could be no valid claim of laches. No special circumstances are drawn to our attention in this case which in our judgment should abbreviate that period.

The sale of certain of the McKillips properties by Jeffrey and Brimmer in 1935 would appear to be a part of the process of foreclosure of the equitable mortgage they held. The McKillips claimed the two remaining parcels of real estate by their cross-petition filed in August of the year 1937. Prior thereto they appeared to have asserted the right to redeem their properties as is disclosed by the letters written by McKillip to Brimmer. It is significant, also, that Jeffrey and Brimmer attempted to sell parcel (c) of the real estate aforesaid to the plaintiff Gould on May 8, 1937. Additionally, the proofs disclose that the McKillips were in actual possession of that parcel of said properties during all of the period since the year 1933.

We conclude, therefore, that the judgment in question should be affirmed.

*Affirmed.*

KIMBALL and BLUME, JJ., concur.