# WALKER et al. v. WOOD.—213 S. W. (2d) 523.

Western Section.    March 12, 1948.

Petition for Certiorari denied by Supreme Court, June 12, 1948.

J. L. Harrington and Schneider & Schneider, all of Jackson, for appellants.

Herron C. Pearson, of Jackson, for appellee.

SWEPSTON, J. This is a suit for the purpose of having a deed absolute declared to be a mortgage, for discovery, accounting and cancellation of the deed upon proof of payment of the debt secured.

The Chancellor held:

(1) That the transaction resulted in a mortgage.

(2) That the debt was not paid as promised.

(3) That the debtor surrendered possession to the mortgagee as absolute owner and orally released his equity of redemption for the consideration stipulated in the original written agreement and confirmed the release by a subsequent written instrument.

(4) That thereafter the mortgagor occupied the premises as a tenant of his grantee.

The bill was accordingly dismissed.

Complainant assigns error as follows:

1. The Chancellor erred in holding that Rhode Walker, by oral agreement, surrender and waived his rights to have his property reconveyed to him by the appellee, E. R. Wood. Tr. pp. 355 & 356.

2. The Chancellor erred in holding that the appellee, E. R. Wood, assumed the indebtedness which Rhode Walker owed the Federal Land Bank of Louisville, Kentucky, in full satisfaction of the indebtness which Rhode Walker owned to him. Tr. pp. 355 & 356.

3. The Chancellor erred in disallowing the appellants' exceptions to the answer to the appellee, E. R. Wood, for insufficiency. Tr. p. 46.

In order to understand these assignments of error it is necessary to state the theories of the respective parties briefly.

It is undisputed that the father of complainants, Rhode Walker, a Negro man, being the owner of 134-2/5 acres of farm land had encumbered same by mortgage to the Federal Land Bank, on which he owed on November 12, 1927, a balance of about $1800.00 and had further encumbered same for a loan of $500.00 due Smith & Crawford. This second loan had been secured by Walker's deed absolute to Smith & Crawford with a contemporaneous collateral defeasance contract in writing that upon re-

payment of the loan, they would reconvey to Walker, but upon failure to pay, Smith & Crawford would hold by said deed as absolute owners.

On November 12, 1927, Walker being unable to pay Smith & Crawford, obtained from defendant, E. R. Wood, a loan of $750.00 due one and two years and to secure same joined with his wife and Smith & Crawford in an absolute deed to Wood with a similar collateral contract as above for reconveyance by Wood to Walker when Walker should repay the loan, but in event of non-payment Wood "is to become the absolute owner of said tract of land, in fee simple, subject to an indebtedness due the Federal Land Bank, of Louisville, Kentucky, which party of the second part in such event agrees to assume", that is, Wood.

The theory of the bill is that, while Walker was unable to repay the loan either as originally agreed, or as extended, yet by agreement, Wood has received a rental share of one-third of all crops since about the year 1932 for the pupose of getting his money out of the place and to reimburse him for payments made to the Land Bank, for taxes, etc. That Wood has received from said land more than enough to liquidate all sums due him. Hence, the complainants seek an accounting and discovery. That Walker died in 1937 and his wife in 1944, and that the complainants did not know until after their mother died that Wood was claiming to be the absolute owner of the land; that they are, and their parents were, uneducated and had confidence in said Wood and necessary inference they have been overreached and imposed upon. That they have been in possession at all times during and since the inception of said loan.

The theory of the answer is that Wood having received no payments in 1928 and 1929 as agreed and having grant-

ed Walker an extension to the fall of 1930 and having made Walker other advances of about $200.00 in 1930, told Walker he could not carry him any further; and would have to take possession of the place; that Walker said he could not pay, that his children would not help him and he agreed to and did surrender possession to Wood as owner; that Walker agreed to pay his cash rent for 1931 and 1932, but failed to pay in 1932; that Wood took possession, rented 37 acres to Walker for one-third of the crops and sowed the rest of the place down; that in 1934 he set aside five acres and a house for the use of Walker which he had rent free until his death in 1937; that Walker's children, the complainants, continued to live on the place, work parts of it and paid Wood one-third of the crops for rent as his tenants; that Wood never agreed to apply the one-third share rent to payment of the debt; that in January 1935, with the knowledge and consent of Walker, Wood paid the $1500.00 mortgage to the Land Bank and that Walker ratified and confirmed in writing the sale of the land to Wood; that during all the years from 1931 forward Wood paid the taxes, managed the place and repaired the houses at his expense; that from 1930 to 1935 or later the place was not worth the total encumbrances on it; that in 1936 Wood paid off the remaining small mortage due the Land Bank; that complainants are barred by laches; that in 1934 he offered to let the children of Walker redeem the place but they were not willing to do so; that he has kept no accurate detailed records, assuming that he was owner, and should not be required to discover the matters called for by the Bill.

The first assignment of error requires discussion of the facts and of the law.

It is argued that since the mortgagor's equity of redemption is an estate in land, it can only be transferred by a proper deed of conveyance.

■ "The general rule is that where a mortgage is in the form of a deed absolute or a conditional sale, the parties may by a subsequent agreement abandon the debt, cancel the agreement to reconvey, and thus change the character of the transaction from that of a mortgage to that of an absolute coveyance, and, although there is authority to the contrary, this rule has even been held applicable in the case of a subsequent parol agreement. . . . In any event the burden of establishing the subsequent agreement is on the mortgagee." 36 Am. Juris. 787 Sec. 190. This is the majority rule. Sauer v. Fischer, 247 Mich. 283, 225 N. W. 518, 65 A. L. R. 771; Tiffany on Real Property, Vol. 3, Sec. 621; Jones on Mortgages, Sec. 338; Trull v. Skinner, 17 Pick., Mass., 213 Watson v. Edwards, 105 Cal. 70, 38 P. 527; Seawell v. Hendricks, 4 Okl. 435, 46 P. 557; Seymour v. Mackey, 126 Ill. 341, 18 N. E. 552; Ferguson v. Boyd, 169 Ind. 537, 81 N. E. 71, 82 N. E. 1064; (Agreement in parol); Greenlaw v. Eastport Sav. Bank, 106 Me. 205, 76 A. 485; (Agreement in parol); Sears v. Gilman, 199 Mass. 384, 85 N. E. 466, 467; Rice v. Crump, 5 Higgins 146, 5 Tenn. Civ. App. 146.

Then we have an early Tennessee Supreme Court case involving a similar transaction and resting partly in parol, wherein the general rule is stated as above. Leiper v. Ransom, 42 Tenn. 511.

"It is admitted the deed from the complainant to defendant, of the 6th of May, 1852, although absolute on its face, was, by the agreement of the parties, contemporaneous with its execution, converted into a mortgage, by which the relations of trustee and cestui que trust were established between the parties.

"But it is insisted by the defendant, that he subsequently purchased from the complainant, his interest in the land, and thereupon the agreement between them, by which the deed of May 6th was converted into a mortgage, was rescinded, and the relation of trustee and cestui que trust, dissolved. This it is argued, could not be done, but we think differently. The cestui que trust may sell the trust property to the trustee, and the trustee may thus acquire a right to the property denuded of the trust, provided it can be shown, by clear and satisfactory proof, that the transaction was fair, without concealment or imposition, and that the cestui que trust intended to part with his interest, and that the same should be acquired by the trustee; and in such cases the transaction will be held valid. . . ."

The Court held there was no fraud or imposition, but that the sale and purchase of the equity of redemption had not been proved.

The Court after discussing the salient points of evidence relied on by the one claiming to have acquired the equity of redemption, such as his having the present possession of the original defeasance agreement, Held as follows:

"All of these facts, unexplained, as they are, fall far short of establishing the fact, that the defendant had purchased from the complainant his interest in the land, or that the agreement entered into, at the time of the execution of the deed, had been rescinded."

It does not appear from the opinion whether the Statute of Frauds, Code, sec. 7831, was plead or considered. But it would seem to have been of no avail, because the Court treated it as an oral rescission of a written contract of defeasance, leaving the deed standing as absolute.

■ We know of no requirement of the Statute of Frauds, Parol Evidence Rule, or other rule of law that prohibits the oral rescission, cancellation, destruction, or abandonment of a written contract for the sale of land. The contract in the instant case goes one step farther than in the case cited; it not only contracts for a defeasance, thereby affording written evidence that the transaction was first a mortgage, but it also provides that upon the contingency of non-payment of the debt, the transaction and deed by the same evidence, the written agreement, are to be a sale for a stated consideration.

The Statute of Frauds, if pertinent to the inquiry at all, has been met by the written agreement; there is no doubt that the debtor did not pay according to contract, so that the only question left for discussion is whether or not the parties carried out the second phrase of the writen contract without fraud or overreaching.

It is argued that the equity of redemption cannot be waived and that it cannot be cut off except by foreclosure in accord with Code Section 7736 and Gibson's Suits in Chancery Section 1037, sub-section 2.

We do not see the relevancy of those authorities. Code Sections 7736 and 7737 both relating to sale under powers contained in the instruction expressly provide that it can be waived in the same instrument.

■ Gibson states:

"All mortgages, and all deeds of trust, howsoever drawn, are deemed in equity as mere securities, notwithstanding any stipulations that the title is to become absolute on certain conditions; and such conveyances constitute mere liens, and must be enforced as such."

No fault can be found with this text because those principles are well settled. Ehert v. Chapman, 67 Tenn. 27.

■ The Chancellor has settled the fact that it was a mortgage. The question whether there should have been a foreclosure and sale is answered by the case above quoted at length and by the question whether the trustee has in good faith and fairly acquired the interest of the cestui que trust pursuant to their prior written agreement and for a valuable consideration. The burden is on the trustee to show this by clear and cogent evidence.

The evidence in the instant case presents the following picture.

A white man who by dint of industry and attention to business with the aid of a good wife had acquired a farm of a few hundred acres of "hill land", on which he lived and on which at the inception of the transaction under consideration he owned a balance of mortgage debt of about $6500.00 in the year 1927.

His next door neighbors across and on the north side of the road were Negro couple, Uncle Rhode and his wife Catherine. Rhode was born in slavery, moved from Georgia to Madison County and acquired the farm above mentioned with the mortgage heretofore mentioned along with a large number of children.

Rhode was a good man. He no doubt lived by the Book and he had the respect and friendship of the white men of the community. He was illiterate and he depended upon the white men of the community to help him financially. He was the kind of man, no doubt, that a white man would go the whole way to help, because when he went to Mr. Wood, he received help although Wood himself was not setting in a bed of roses. His own home was mortgaged and he wasn't tossing any twenty dollar bills to bell-hops, but he agreed to help.

It must be recalled that this situaton arose before the National Government awoke to the necessity of doing

something for the farmers to put them nearer to a parity with the industrial interests of this county, from whom the farmer has always bought on a protected market and to whom and generally he has sold on an unprotected market; also before the days of soil conservation.

The value of Uncle Rhode's farm was in 1927 between $2000.00 and $2500.00, although it was assessed for taxation at $5500.00, so that when this loan of $750.00 was put in behind the $1800.00 due the Land Bank, there was no equity in the place. In 1930 the assessment was reduced to $2500.00.

Mr. Wood like Smith & Crawford, because of the Land Bank first mortgages, did not want a trust deed set-up because of the difficulty of foreclosing, if such became necessary, so they each adopted the absolute deed with a collatral contract as stated above.

Uncle Rhode's farm was "run down", so if Mr. Wood had been looking for a bargain in case of foreclosure, he must have been a clairvoyant if he saw it there. But he was willing to take a chance to help Rhode, probably being of a sanguine nature like Mr. Micawber's always expecting something to turn up. However, Wood did not purpose to carry the loan indefinitely and so it was to be repaid within two years, because Wood has his own batch of troubles.

Uncle Rhode received the temporary surcease by the loan, but it was short lived. He paid nothing in 1928 or 1929. In 1930 he couldn't pay his 1929 taxes, so Mr. Wood paid them and extended the debt to the fall of 1930. Uncle Rhode needed about ninety dollars worth of seed corn; Wood paid for it.

In the meantime the depression of 1929 had come upon us. So Wood told Uncle Rhode in the fall of 1930 that he would have to take over the place. Uncle Rhode

agreed to it. We all know that the future looked dark at the stage of the depression. He did not know where he could get any assistance; he told Wood to take the place that it was already his but asked that he not be put off the place. Wood took over the place and told Rhode to stay there with his children and work. He rented to Rhode for cash in 1931 and 1932, but Rhode fell short the latter year by about seventy dollars of paying rent and furnish account. Then Wood let Rhode have 37 acres on a share rent of a third and sowed down the rest of the place. In 1934 he gave Rhode the use rent free of a house and five acres, which he had until he died in 1937. Rhodes children lived on the place as share tenants of Wood, received their share of the parity payments and ginning exemption certificates, just as all other tenants on other farms.

In 1934 Wood was agreeable to the children redeeming the place, but none of them were interested.

In the meantime in January 1935 Wood paid over $1300.00 in full of the larger Land Bank mortgage and in 1936 the smaller mortgage of somewhat less than $300.00.

On March 18, 1935, Rhode signed a paper at the Land Bank acknowledging sale of the place to Wood, who by the same instrument assumed the unpaid balance due the Land Bank. Rhode was not released from liability to the Land Bank, but under familiar rules Wood became principal and Rhode became surety. Knox v. McCain, 81 Tenn. 197, 198; Snyder v. Summers, 69 Tenn. 534, 27 Am. Rep. 778.

Wood has paid all taxes, repairs and looked after the place since 1930.

It is clear that the complainants knew as early as about 1940 that Wood claimed the absolute ownership of the

place because he heard rumors that they were going to sue him and talked to one of them about it.

The complainants admit that they have no knowledge of the business dealings of Wood and their father. They testify to alleged statements of their father to them, not in the presence of Wood, that the one-third rent was to apply against the debt of Rhode. But this is implausible since Wood would have been taking all the risk of business conditions before the return of prosperity before the farm-aid program began with the "plow-up", in 1933; he would have received nothing for his services as manager and operator of the farm; he could have had an immediate formal foreclosure any time after 1928.

Clarence Walker and his wife testify that they borrowed $43.75 from Wood in December 1930 to make the payment due the Land Bank, which was after Wood says he took over the place. They say the note for $5375, Clarence's Exhibit "B", evidences the loan; that they gave the money to Mollie to send in. But Mollie was dead when the proof was taken and there is no receipt shown by them. The payment due to the Bank was actually $48.75.

Some of the complainants testify that Rhode had receipts from the Land Bank for payments made after 1930. This is explained, however, by the fact that the Bank did not know Wood in the matter until he notified them to send the receipts to him.

We, herefore, find that Wood has shown the utmost good faith and that he purchased the interest of Rhode in 1930 in accord with the terms of the collateral agreement.

Defendant has plead the second clause of the first section of the Act of 1819, Code Section 8583 of the Statutes of Limtations.

It is unnecessary to discuss this other than to say that, unless the facts had already been found as above, there would be no adverse possession. If there had never been a termination of the relationship of mortgagor and mortgagee, then Code Section 8589 would apply and by its express terms the possession would not be adverse.

We think it likewise unnecessary to discuss the defense of laches.

The first assignment of error is overruled.

The second assignment is overruled for the reason that it does not state correctly the holding of the Chancellor.

■ The decree is, that the said Wood (1) accepted said land subject to the Federal Land Bank indebtedness and (2) assumed said indebtedness in full satisfaction of the debt due him by Walker.

This decree was correct.

The third assignment must be overruled. The substance of the discovery called for by the Original Bill was a rendition of an account between defendant and Rhode Walker from 1927 to 1944. It appeared to the Chancellor that this would not be necessary until complainants had first established their primary right to relief against defendant. Otherwise they were entitled to no accounting.

■ Unless the matters sought to be discovered are necessary to enable the complainant to make out his case, it is unusual and improper to require defendant to account until the rights of the parties have been settled. It is analogous to the rules relating to references to a Master.

Gibson Suits in Chancery, Sec. 599.

We, therefore, affirm the decree with the costs against appellants.

Baptist, P. J., and Adams, Sp. J., concur.