FILED
07/09/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 17, 2018 Session

## TENNESSEE TRADERS LANDING, LLC v. JENKINS & STILES, LLC

Appeal from the Chancery Court for Knox County
No. 191637-2      Clarence E. Pridemore, Jr., Chancellor

No. E2017-00948-COA-R3-CV

This case involves a dispute concerning the validity of an oral agreement to rescind a written commercial lease agreement. In May 2011, the plaintiff company entered into a written lease, agreeing to rent a commercial building to the defendant company for a set term of three years and nine months. The lease provided for the first nine months of tenancy without rental payments, setting rental payments at $2,250.00 per month for the remainder of the initial term. At some time during the latter part of 2011, the two companies' respective presidents purportedly met and mutually agreed to terminate and rescind the lease. The presidents' agreement was never memorialized in writing, however, and the lease contained a provision that prevented any oral modification to the contract. Neither company thereafter acted in accordance with the lease until November 24, 2015, when the plaintiff's new president contacted the defendant in writing, demanding thirty-six months of unpaid rent in addition to a five-percent late fee pursuant to the lease, for a total of $85,050.00. The defendant did not tender any payment to the plaintiff as requested. On May 17, 2016, the plaintiff filed a complaint in the Knox County Chancery Court ("trial court"), alleging unpaid rent and requesting an award of rent payments, late fees, and reasonable attorney's fees. The defendant filed an answer, asserting, *inter alia*, that the lease was invalid as a result of the oral rescission by mutual agreement in 2011. Upon cross-motions for summary judgment, the trial court granted summary judgment in favor of the plaintiff, awarding a monetary judgment in the amount of $92,208.75, representing an $81,000.00 balance of unpaid rent, $4,050.00 in late fees, and $7,158.75 in reasonable attorney's fees and expenses. The defendant filed a motion to alter or amend judgment, which the trial court denied. The defendant has appealed. Having determined that the lease did not prohibit an oral rescission by mutual agreement, we reverse the grant of summary judgment to TTL. Having also determined that a genuine issue of material fact remains as to whether TTL's former president possessed the authority to orally rescind the lease, we affirm the denial of summary judgment to J&S and remand for evidentiary proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., joined. CHARLES D. SUSANO, JR., J., not participating.

Kevin C. Stevens and Briton S. Collins, Knoxville, Tennessee, for the appellant, Jenkins & Stiles, LLC.

Lawrence P. Leibowitz and Brandon J. Tindell, Knoxville, Tennessee, for the appellee, Tennessee Traders Landing, LLC.

## OPINION

### I. Factual and Procedural Background

On May 10, 2011, the plaintiff, Tennessee Traders Landing, LLC ("TTL"), entered into a commercial lease agreement ("Lease") with the defendant, Jenkins & Stiles, LLC ("J&S"), for the occupation of unfinished office space and warehouse storage located on Byington Solway Road in Knoxville, Tennessee, for an initial period of three years and nine months. The parties acted through their respective presidents at the time, Christopher ("Chris") Gettelfinger, who was TTL's president, and Bart Jenkins, who was J&S's president.[1] The Lease sets forth a "base rent" schedule of "free rent" for the first nine months following the Lease's execution and $2,250.00 due each month thereafter for three years, comprising a "Basic Initial Term" of three years and nine months. The Lease then sets forth renewal option periods at incrementally higher rental rates provided certain conditions are met. Under the Lease, the initial three-year term during which rent payments would have been due spanned February 10, 2012, through January 10, 2015.

The Lease also includes the following pertinent provisions:

**I. Premises.**

\* \* \*

**(D) Condition of Premises.** The Premises is [sic] leased to Tenant in its present physical condition and state of title (including, without

---

[1] According to TTL's corporate documents submitted with J&S's cross-motion for summary judgment, Mr. Jenkins was also the secretary of TTL at some time in 2011. Mr. Jenkins ceased acting in this capacity by the commencement of the instant action, although no indication of an exact date is in the appellate record.

limitation, matters of survey and zoning, building and other laws, regulations and restrictions now and hereafter in effect), and Landlord makes no representation or warranty with respect thereto.

* * *

**III.  Improvements.**  Landlord shall not be required to make any improvements to the Premises.  Unless otherwise allowed by this Lease, Tenant shall not make improvements to the Premises.  Notwithstanding the foregoing, at any time during the Basic Initial Term (defined below), Tenant shall have the option to ask Landlord to covert [sic] the above referenced unfinished office space of [the Premises] into finished office space at Landlord's expense ("Option"). . . .

* * *

**XIV.  Default.**  If any one or more of the following events shall occur, an "Event of Default" shall have occurred under this Lease:

> **(A) Non-Payment.**  If Tenant shall fail to pay any installment of Rent (including Base Rent, Additional Rent or other sums due from Tenant to Landlord under this Lease);

* * *

**XV.  Remedies.**

> **(A) Right to Terminate Lease.**  If there shall occur an Event of Default, then Landlord may, in addition to any other remedy available to Landlord under this Lease or in law or at equity, at Landlord's option, declare this Lease terminated and Tenant shall quit and surrender possession of the Premises, but Tenant shall remain liable to Landlord as hereinafter provided.

> * * *

> **(D) Survival Covenant - Liability of Tenant after Re-Entry and Possession or Termination.**

> > **(1)  Survival of Obligations.**  If any Event of Default occurs (whether or not this Lease shall be terminated as a result of an

3

Event of Default), Tenant shall remain liable to Landlord for all Base Rent, Additional Rent, and other sums herein reserved (including, but not limited to, the expenses to be paid by Tenant pursuant to the provisions of this Lease); less the net amount of rent, if any, that shall be collected and received by Landlord from the Premises, for and during the remainder of the Term of this Lease.  In addition, Landlord may, from time to time, without terminating this Lease, as agent for Tenant, re-let the Premises or any part thereof for such term or terms, at such rental or rentals, and upon such other terms and conditions as Landlord may deem advisable, in accordance with the provisions of Section XV(C) above. The failure or refusal of Landlord to re-let the Premises or any part thereof shall not release Tenant or affect Tenant's liability for damages. . . .

**(2)  Rights on Termination.** . . . Landlord shall not, by any re-entry or other act, be deemed to have terminated this Lease, unless Landlord shall notify Tenant in writing that Landlord has elected to terminate the same.

**(E)  Landlord's Right to Cure.**  Landlord may, but shall not be obligated to, cure any default by Tenant . . . .

* * *

**(H) Attorney's Fees.**  In the event it becomes necessary for the Landlord to employ attorneys or institute any legal proceedings for the enforcement or protection of its rights hereunder or as a result of an Event of Default, Tenant agrees to pay Landlord's reasonable attorney's fees and all court and other costs incurred by reason thereof.

* * *

**XXI.  Limitations on Landlord's Liability.**

* * *

**(B)   Remedy.** . . . No person who is an officer, director, shareholder, member (or principal or partner or other constituent person or entity of any

non-corporate Landlord), employee, agent, or legal representative of Landlord shall be personally liable for any obligations or liabilities of Landlord under this Lease.

\* \* \*

## XXVI. Miscellaneous.

\* \* \*

**(I)  Waiver.**  No course of dealing on the part of Landlord, its members, agents, or representatives, and no failure or delay by Landlord with respect to the exercise of any right, power, or privilege by Landlord under this Lease shall operate as a waiver thereof, or any single or partial exercise of any such right, power, or privilege.  No waiver of any Event of Default shall be effective unless in writing, signed by the Landlord.  No waiver of any Event of Default shall preclude any later exercise thereof or any exercise of any right, power, or privilege hereunder.  No waiver of any Event of Default or forbearance on the part of the Landlord in enforcing any of its rights under this Lease shall operate as a waiver of any other default or right or of the same default or right in future occasions.

**(J) Entire Agreement; Modification.**  It is understood and agreed by and between the Parties hereto that this Lease contains the final and entire agreement between said Parties, and that they shall not be bound by any terms, statements, conditions or representations, oral or written, express or implied, not herein contained.  This Lease may not be modified orally or in any manner other than by written agreement signed by the Parties hereto.

Although the Lease makes no mention of its purpose or the parties' intent, Chris Gettelfinger and Mr. Jenkins stated in their respective affidavits, attached to J&S's motion for summary judgment, that the parties entered into the Lease in order to assist TTL with securing financing for its business operations.  According to Chris Gettelfinger and Mr. Jenkins, TTL was ultimately unable to secure financing.  The affiants further stated that Chris Gettelfinger met with Mr. Jenkins at some time near the end of 2011 and mutually agreed to "terminate and rescind" the Lease.  TTL claims that it had no knowledge of this meeting and that Chris Gettelfinger did not have the authority as president when meeting with Mr. Jenkins to terminate and rescind the Lease.  It is undisputed that J&S never took possession of the office space under the Lease and that neither party took any action related to the Lease for its duration.

On June 16, 2014, Chris Gettelfinger resigned as president of TTL, and the company appointed Richard Jeffrey Gettelfinger ("Richard Gettelfinger") as president in his place.[2]  On November 12, 2015, Richard Gettelfinger sent J&S a letter on behalf of TTL, demanding thirty-six months of unpaid rent and late fees under the Lease, totaling $85,050.00.  J&S did not tender the sum to TTL as requested.  On May 17, 2016, TTL filed a complaint in the trial court, seeking enforcement of the Lease and requesting as damages the unpaid rent, late fees, prejudgment interest, court costs, and attorney's fees.  J&S initially responded with a motion to dismiss under Tennessee Rule of Civil Procedure 12.02(6), citing TTL's January 2015 dissolution as an LLC.  J&S subsequently withdrew the motion when TTL acquired a retroactive reinstatement as an LLC from the Tennessee Secretary of State.

On August 22, 2016, J&S filed an answer in which it acknowledged having entered into the Lease but denied the "validity and enforceability" of the Lease or any liability for rental payments.  J&S asserted that Mr. Jenkins had been a member of TTL at the time of the Lease's execution and had surrendered his membership interest upon Chris Gettelfinger's assurance "that such surrender would secure [J&S's] release" from the Lease.  J&S also averred that if the Lease were an enforceable contract, TTL had breached it first due to its alleged failure to make "Landlord Improvements."  J&S further asserted affirmative defenses of equitable estoppel, unclean hands, and laches.  As to the latter, J&S averred that TTL had not demanded a rent payment until it sent a demand letter to J&S on November 24, 2015.[3]  Although J&S acknowledges that the purported oral agreement to terminate and rescind the Lease was never memorialized in writing, J&S maintains on appeal that Mr. Jenkins (as president of J&S) "believed in good faith that Chris Gettelfinger (as TTL's former president and chief manager) was authorized to act on TTL's behalf to rescind the Lease."

On November 8, 2016, TTL filed a motion for summary judgment based on the terms of the Lease and J&S's failure to pay rent.  In response to J&S's argument regarding landlord improvements, TTL averred that no improvements were required under the Lease prior to J&S's occupation.  TTL attached to its motion an affidavit by Richard Gettelfinger, the current president of TTL.  In his affidavit, Richard Gettelfinger stated, as pertinent to this appeal:

---

[2] We note that Richard Gettelfinger is occasionally referred to by his middle name, Jeffrey, in the record. For ease of reference, we refer to Chris Gettelfinger and Richard Gettelfinger by their first and last names. No disrespect is intended.

[3] November 24, 2015, is the date when J&S received TTL's letter demanding rent.  Whether the letter was effective on the date it was sent or the date it was received is a *de minimus* distinction in this case.

A balance of $81,000.00 remains due and payable under the Lease Agreement, along with $4,050.00 in late charges, and $7,158.75 in costs and attorney's fees as of October 14, 2016, for a total of $92,208.75.

There have been no other agreements that supercede [sic] or release [J&S] from its obligations under the Lease Agreement.

(Paragraph numbering omitted.)

On December 7, 2016, J&S filed a response and a cross-motion for summary judgment, asserting as grounds that "the undisputed material facts show that there was a mutual rescission and termination of the subject Lease so as to release [J&S] from any obligations thereunder." J&S attached to its motion affidavits executed by Chris Gettelfinger and Mr. Jenkins. Chris Gettelfinger stated in his affidavit that he had been president and chief manager of TTL until mid-2014. He further stated in pertinent part:

In order to assist TTL in obtaining financing for renovations to the Building, I asked Mr. Jenkins to sign a lease agreement for a portion of the Building. At the time, it was understood that TTL would be expected to perform renovations to the Building before J&S would ever be able to use the space.

Mr. Jenkins signed the May 10, 2011 Lease Agreement . . . on behalf of J&S to assist TTL in obtaining a loan for renovations to the Building.

Unfortunately, TTL was unable to secure financing to perform the necessary renovations to the Building. Without this financing, TTL could not perform the renovations.

Due to TTL's inability to perform the necessary renovations to the Building, TTL and J&S mutually agreed to terminate and rescind the Lease. This occurred during a conversation between me and Mr. Jenkins.

Although TTL and J&S did not memorialize the Lease's termination and rescission in writing, it was my intention as TTL's president and chief manager to terminate and rescind the Lease and release J&S from any of its obligations by virtue of this conversation.

To that end, neither of the parties thereafter took action to perform the Lease.

7

(Paragraph numbering omitted.)

Mr. Jenkins's affidavit essentially corroborated Chris Gettelfinger's affidavit, stating in pertinent part:

Due to TTL's inability to perform the necessary renovations to the Building, TTL and J&S mutually agreed to terminate and rescind the Lease. This occurred during a conversation between me and Chris Gettelfinger in the winter of 2011.

Although TTL and J&S did not memorialize the Lease's termination and rescission in writing, it was my intention as J&S's president to terminate and rescind the Lease and release TTL from any of its obligations by virtue of this conversation.

To that end, neither of the parties thereafter took action to perform the Lease.

TTL never undertook nor satisfied any of its obligations under the Lease, including the construction of required landlord improvements, nor did TTL ever ask for or make demand on J&S for any monies contemplated by the Lease until Richard J. Gettelfinger sent me the letter attached hereto as **Exhibit 1** on or about November 24, 2015.

(Paragraph numbering omitted.)

On January 9, 2017, TTL filed a response to J&S's cross-motion for summary judgment and a reply to J&S's response, attaching an affidavit executed by Sidney Blalock, who had been a member of TTL when the Lease was executed.[4] Mr. Blalock stated that "to the best of [his] knowledge," a meeting to release J&S from the Lease had not occurred and that Chris Gettelfinger had not been authorized by a vote of J&S members to "cancel" the Lease, "as doing so put members, including [himself], in danger of personal liability as guarantors of certain loans." J&S subsequently filed a reply to TTL's response and a sur-reply to TTL's reply, attaching TTL's answers to a set of interrogatories, several documents related to membership in TTL, and a second affidavit from Mr. Jenkins. J&S asserted, *inter alia*:

When TTL and J&S mutually agreed to terminate and rescind the subject Lease in the winter of 2011, it was Bart Jenkins's belief, both

---

[4] Specifically, Mr. Blalock was a member of Vol-Kat One, LLC, which in turn was the sole member of TTL at the time of trial.

8

personally and as J&S's president, that Chris Gettelfinger, as TTL's president and chief manager, was authorized to act on TTL's behalf and to bind TTL to the mutual termination and rescission of the Lease.

Following a hearing conducted on January 17, 2017, the trial court denied J&S's motion for summary judgment and granted summary judgment in favor of TTL, awarding to TTL a money judgment in the amount of $92,208.75. In an order entered February 8, 2017, the trial court specifically found:

> With respect to [TTL's] Motion for Summary Judgment, and in accordance with Rule 56.04 of the Tennessee Rules of Civil Procedure, the Court specifically finds that there is no genuine issue as to any material fact as to [J&S's] execution of the Lease Agreement and that a valid agreement was entered into between [J&S] and [TTL]; that rent was set at $2,250.00 per month; that rental payments were to commence nine (9) months after the execution of the Lease Agreement and continue for a minimum of thirty-six (36) months; that no rent was ever paid by [J&S]; that an oral modification or termination of the Lease Agreement was invalid as a matter of law; and that the amount due under the Lease Agreement as of October 14, 2016 was $92,208.75, consisting of a principal balance of $81,000.00, late charges of $4,050.00, and attorney's fees and costs of $7,158.75.

J&S filed a motion to alter or amend the judgment, pursuant to Tennessee Rule of Civil Procedure 59.04, on March 6, 2017. Following a hearing conducted on April 17, 2017, the trial court denied the motion to alter or amend in an order entered April 25, 2017. J&S timely appealed.

## II. Issues Presented

J&S presents three issues on appeal, which we have restated slightly as follows:

1.   Whether the trial court erred by granting summary judgment in favor of TTL.

2.   Whether the trial court erred by denying summary judgment in favor of J&S.

3.   Whether the trial court erred by denying J&S's motion to alter or amend the judgment.

9

## III. Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)). As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

> We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. [574,] 586, 106 S.Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage,

not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65. Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014).

We review the trial court's interpretation of a written agreement, *de novo* with no presumption of correctness. *See Ray Bell Constr. Co., Inc. v. State, Tenn. Dep't of Transp.*, 356 S.W.3d 384, 386 (Tenn. 2011); *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). As this Court has previously explained:

> In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). A determination of the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am. Jur. 2d, Contracts, § 245).

*Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Jan. 30, 2006).

Similarly, interpretation of a statute is a question of law, which we review *de novo* with no presumption of correctness. *See In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009). Our Supreme Court has summarized the principles involved in statutory construction as follows:

11

When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995).

*Id.* at 613-14.

## IV. TTL's Motion for Summary Judgment

J&S contends that the trial court erred by granting summary judgment in favor of TTL because an oral rescission of the Lease was valid as a matter of law and the existence of the oral rescission was supported by affidavits from Chris Gettelfinger and Mr. Jenkins. In contrast, TTL claims that any oral agreement regarding the Lease would be invalid as a matter of law because the Lease prevented oral modifications and because Chris Gettelfinger purportedly did not have the authority to act on behalf of TTL when rescinding the Lease. Although TTL disputes that Chris Gettelfinger and Mr. Jenkins validly rescinded the Lease, TTL does not expressly dispute that the two individuals met near the end of 2011 for this purpose. The validity of Chris Gettelfinger's oral agreement with Mr. Jenkins is thereby dispositive of J&S's argument on appeal. Upon an examination of the record and applicable law in Tennessee, we determine that the Lease

did not prevent an oral rescission by mutual agreement. We further determine that a genuine issue of material fact exists as to whether Chris Gettelfinger acted on behalf of TTL when he met with Mr. Jenkins near the end of 2011 to orally rescind the Lease.

## A. Validity of an Oral Rescission

TTL's primary argument in support of the trial court's grant of summary judgment in its favor relies on section XXVI(J) of the Lease, which specifically provides that "[t]his Lease may not be modified orally or in any manner other than by written agreement signed by the Parties hereto." We note, however, that J&S does not assert that the parties orally modified the Lease in any way. Instead, J&S argues that the parties orally terminated and rescinded the Lease. We do not agree with TTL's *sub silentio* argument that rescission and modification are interchangeable terms of art. As this Court has explained:

> In Tennessee, it has long been held that a contract may be rescinded with the mutual consent and agreement of the parties. *Wright v. Fischer*, 148 S.W.2d 49, 53 (Tenn. Ct. App. 1940). Tennessee law also "requires that the termination of a contract by mutual consent of both parties be positive, clear, and unambiguous, conveying an unquestioned purpose to terminate the contract." *Russom v. Ins. Co. of N. Am.*, 421 F.2d 985, 993 (6th Cir. 1970). Furthermore, this agreement to rescind a contract may be an oral agreement. In *Tidwell v. Morgan Bld. Sys., Inc.*, 840 S.W.2d 373, 376 (Tenn. Ct. App. 1992), the parties made a contract for the purchase of a metal building and, subsequently, orally agree upon a larger building. Said the court:
>
>> The original contract, signed by the parties, provided that it could only be modified in writing. There is no dispute between the parties that they subsequently agreed upon a larger building at an increased purchase price. . . . We believe that the evidence is clear that the parties mutually agreed to rescind the first contract. As we interpret the written agreement and T.C.A. § 47-50-112, neither prohibits the parties from rescinding a written agreement by mutual oral agreement . . . While rescission must be clearly expressed, the acts and conduct of the parties may also be sufficient to effect the mutual rescission where the acts and conduct are positive, unequivocal, and inconsistent with the contract's existence. *Arkansas Dailies, Inc. v. Dan*, 36 Tenn. App. 663, 671, 260 S.W.2d 200, 203 (1953).

13

* * *

Neither the Parol Evidence Rule nor the Statute of Frauds is applicable when an oral agreement to rescind is established by clear and convincing evidence. In this case the evidence is practically undisputed. This Court has held: "We know of no requirement of the Statute of Frauds, Parol Evidence Rule, or other rule of law that prohibits the oral rescission, cancellation, destruction or abandonment of a written contract for the sale of land." *Walker v. Wood*, 213 S.W.2d 523, 526 (Tenn. Ct. App. 1948); *see also Early v. Street*, 241 S.W.2d 531 (Tenn. 1951); *McIntosh v. Goodwin*, 292 S.W.2d 242 (Tenn. Ct. App. 1954). The only exception to such a rule involves cases where the rights of third parties have intervened. *See Wright v. Fischer*, 148 S.W.2d at 53.

*Crye-Leike, Inc. v. Estate of Earp*, No. M2003-00740-COA-R3-CV, 2004 WL 2636707, at *7 (Tenn. Ct. App. Nov. 18, 2004). Therefore, inasmuch as no rule of law prevents an oral rescission of a contract through mutual agreement, we determine that the provision prohibiting oral modifications to the Lease is inapplicable to termination or rescission of the same.

For this reason, we do not find TTL's reliance on Tennessee Code Annotated § 47-50-112(c) (2013) to be applicable to the instant case. Specifically, this statutory section provides in pertinent part:

(a)   All contracts, including, but not limited to, notes, security agreements, deeds of trust, and installment sales contracts, in writing and signed by the party to be bound, including endorsements thereon, shall be prima facie evidence that the contract contains the true intentions of the parties, and shall be enforced as written; . . . .

* * *

(c)   If any such security agreement, note, deed of trust, or other contract contains a provision to the effect that no waiver of any terms or provisions thereof shall be valid unless such a waiver is in writing, no court shall give effect to any such waiver unless it is in writing.

Tenn. Code Ann. § 47-50-112. We interpret the plain language of subsection -112(c) to be applicable to a waiver of contract terms or provisions and not to an oral rescission of a

14

written contract by subsequent mutual agreement. *See Tidwell v. Morgan Bldg. Sys., Inc.*, 840 S.W.2d 373, 376 (Tenn. Ct. App. 1992).

We are also not persuaded by TTL's reliance on the statute of frauds in support of its argument. Tennessee's statute of frauds is codified at Tennessee Code Annotated § 29-2-101 (2012), which states in pertinent part:

> No action shall be brought . . . [u]pon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one (1) year . . . unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party. . . .

Tenn. Code Ann. § 29-2-101(a)(4). The statute of frauds is an affirmative defense. *See* Tenn. R. Civ. P. 8.03; *Waddle v. Elrod*, 367 S.W.3d 217, 223 (Tenn. 2012). Inasmuch as TTL is prosecuting this action upon a written instrument, the Lease, it cannot rely upon the statute of frauds as though it were defending against an action. J&S has not improperly relied upon an oral agreement to prosecute an action or for any of the conditions outlined in Tennessee Code Annotated § 29-2-101. Moreover, "[n]either the Parol Evidence Rule nor the Statute of Frauds is applicable when an oral agreement to rescind is established by clear and convincing evidence." *Crye-Leike*, 2004 WL 2636707, at *7.

TTL does not reference section XV(D)(2) of the Lease in its argument, but we find it necessary to address the provision here. Section XV(D)(2) provides in pertinent part:

> Landlord shall not, by any re-entry or other act, be deemed to have terminated this Lease, unless Landlord shall notify Tenant in writing that Landlord has elected to terminate the same.

Restrictions on modifications to written contracts are not necessarily applicable to termination or rescission of a contract, but section XV(D)(2) appears to be a specific restriction on termination. We determine, however, that the unilateral termination as contemplated in the Lease is not equivalent to a rescission by mutual agreement, which J&S contends occurred near the end of 2011.[5]

---

[5] We recognize that "termination" and "rescission" are not used as distinct terms in all situations. *See, e.g.*, JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS § 21-2, at 864-65 (3d ed. 1987) ("[T]he term 'rescission' is often used by lawyers, courts and businessmen in many different senses . . . In the interests of clarity of thought—as the consequences of each of these forms of discharge may vary—the [Uniform] Commercial Code carefully distinguishes three circumstances. . . . Section 2-

The Lease in this case contemplates termination as a unilateral right given to either party under certain circumstances to bring an end to the agreement without necessarily discharging the parties' remaining duties. In contrast, a mutual rescission is an agreement by contracting parties to discharge all remaining duties of performance. *See* Restatement (Second) of Contracts § 283(1) (1981) (Am. Law Inst. 1981). J&S does not contend that TTL terminated the lease under the specific terms of the contract but rather that the parties mutually rescinded the contract through a meeting of the minds. As our Supreme Court has explained:

> A written bargain is of no higher legal degree than a parol one. Either may vary or discharge the other, and there can be no more force in an agreement in writing not to agree by parol than in a parol agreement not to agree in writing. Every such agreement is ended by the new one which contradicts it.

*Coop. Stores Co. v. U.S. Fid. & Guar. Co.*, 195 S.W. 177, 180 (Tenn. 1917) (quoting *Am. Cent. Ins. Co. v. McCrea, Maury & Co.*, 76 Tenn. 513, 524 (1881)); *see Hannahan v. Hannahan*, 247 S.W.3d 625, 628 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. Oct. 22, 2007) ("[S]imple contracts, whether written or otherwise, are, in the absence of a statute changing the rule, of the same dignity in contemplation of law . . . ." (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990))); Restatement (Second) of Contracts § 283(1), cmt. b ("Even a provision of the earlier contract to the effect that it can be rescinded only in writing does not impair the effectiveness of an oral agreement of rescission. In the absence of statute, such a self-imposed limitation does not limit the power of the parties subsequently to contract.").

We therefore determine that the Lease's restriction on either party's ability to unilaterally terminate the contract under specific circumstances does not amount to an equivalent restriction on the parties' ability to orally rescind the Lease through mutual agreement. We conclude that under the specific terms of the Lease, the parties were able to orally rescind the Lease so long as their mutual agreement to do so was "positive, clear, and unambiguous, conveying an unquestioned purpose to terminate the contract." *Crye-Leike*, 2004 WL 2636707, at *7 (quoting *Russom v. Ins. Co. of N. Am.*, 421 F.2d 985, 993 (6th Cir. 1970)).

---

720, however, takes into account that the parties do not necessarily use these terms in this way."). It is of particular note in this case that the Lease solely provides for unilateral termination by either party in response to a breaching condition and makes no mention of termination or rescission through mutual agreement. Our distinction in this case is not necessarily between specific terms, but rather between the nature of each party's conduct in terminating, rescinding, or breaching the Lease.

## B. Effectiveness of the Oral Rescission

Having determined that the Lease did not prevent an oral rescission by mutual agreement and that TTL has not presented evidence refuting Chris Gettelfinger's and Mr. Jenkins's affidavits purporting to have rescinded the lease on behalf of the parties, we address the legal validity of the oral agreement in dispute. The validity of the oral agreement specifically depends on (1) whether the oral agreement was sufficient enough to express a rescission and (2) whether the individuals rescinding the Lease properly acted on behalf of their respective companies.[6]

J&S contends that the affidavits of Chris Gettelfinger and Mr. Jenkins, coupled with the inactive conduct of the parties over the term of the Lease, are sufficient evidence of mutual rescission. J&S also argues that Chris Gettelfinger and Mr. Jenkins each had authority to act on behalf of the respective parties in rescinding the Lease. In contrast, TTL contends that the "secret agreement" between Chris Gettelfinger and Mr. Jenkins was not sufficiently positive, clear, and unambiguous and that Chris Gettelfinger was never authorized by TTL to rescind the lease. Upon a thorough review of the record, we determine that the Chris Gettelfinger and Mr. Jenkins clearly and unambiguously expressed their mutual intent to rescind the Lease. We further determine that TTL has not presented sufficient evidence demonstrating that Chris Gettelfinger had no authority to act on behalf of TTL when he entered into an oral agreement to rescind near the end of 2011.

TTL disputes the validity of any oral agreement made between Chris Gettelfinger and Mr. Jenkins and the authority of Chris Gettelfinger to act on behalf of TTL, but it does not dispute the fact that Chris Gettelfinger actually met with Mr. Jenkins near the end of 2011. TTL also has not refuted that Chris Gettelfinger and Mr. Jenkins agreed to rescind the Lease during that meeting. Specifically, TTL filed a response to J&S's proposed statement of undisputed material facts on January 9, 2017, stating as follows in relevant part:

14.    Due to [TTL's] inability to perform the necessary renovations to the Building, [TTL] and [J&S] mutually agreed to terminate and rescind the Lease during a conversation between Chris Gettelfinger and Bart Jenkins that occurred in the winter of 2011.

**RESPONSE:**    Disputed as renovations were not required under the Lease Agreement. Further, Chris Gettelfinger did not

---

[6] We note that the parties do not dispute Mr. Jenkins's authority to act on behalf of J&S as its president.

17

have the authority from [TTL] to terminate the Lease Agreement.

15. Although [TTL] and [J&S] did not memorialize the Lease's termination and rescission in writing, it was Chris Gettelfinger's intention as [TTL's] president and chief manager, and Bart Jenkins's intention as [J&S's] president, to terminate and rescind the Lease and to release [TTL] and [J&S] from any of their obligations by virtue of this conversation.

**RESPONSE:** Undisputed that there is no writing to support the termination of the Lease Agreement. Disputed in that Chris Gettelfinger did not have the authority from [TTL] to terminate the Lease Agreement.

(Internal citations to record omitted.) When questioned during oral argument before this Court as to whether there would be a genuine issue of material fact remaining if an oral rescission of the Lease were legally possible, TTL's counsel responded:

No, your honor, because I don't believe that there is evidence of an oral rescission sufficient to allow—under the law, as a matter of law—to allow the rescission to be given any effect . . . the only thing here is—after the fact—affidavits from the two guys who were involved in business together anyway, saying: "Hey, we're out; you don't need to pay that lease."

We note that on appeal, TTL repeatedly refers to Chris Gettelfinger and Mr. Jenkins as "co-conspirators" with "self-serving" affidavits. TTL also suggested during oral argument that any determination of a valid rescission of the Lease should prompt a remand for trial as to whether there was "collusion" between Chris Gettelfinger and Mr. Jenkins. Although TTL appears to question the credibility of Chris Gettelfinger and Mr. Jenkins, potential credibility of the affiants is not an issue at this summary judgment stage. *See Tatham v. Bridgestone Americas Holding, Inc.*, 473 S.W.3d 734, 752 (Tenn. 2015); *Sampson v. Wellmont Health Sys.*, 228 S.W.3d 124, 135 (Tenn. Ct. App. 2007), *perm. app. denied* (Tenn. June 18, 2007) ("On summary judgment—being a proceeding strictly 'on the papers'—testimony cannot be disregarded on the basis of a lack of credibility."). TTL did not allege conspiracy before the trial court, and TTL has not explicitly claimed that either Chris Gettelfinger or Mr. Jenkins submitted false statements in their respective affidavits. TTL also has not directly alleged that J&S submitted any affidavits in bad faith, and the trial court did not find that either party acted in bad faith. *See* Tenn. R. Civ. P. 56.08.

18

Turning to whether the parties sufficiently expressed their rescission of the Lease, we note at the outset that Richard Gettelfinger and Mr. Blalock, two parties directly involved in the financial operations of TTL during the commencement of this action, were not privy to the oral agreement purportedly rescinding the Lease. J&S contends that the trial court thereby erred by admitting the affidavits of Richard Gettelfinger and Mr. Blalock because they had no personal knowledge of the oral agreement. *See* Tenn. R. Civ. P. 56.06 ("Supporting and opposing affidavits shall be made on personal knowledge, such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

We do not interpret the trial court's ruling that "an oral modification or termination of the Lease Agreement was invalid as a matter of law" to be improperly reliant on the affidavit of either Richard Gettelfinger or Mr. Blalock. There is also no indication that the trial court improperly weighed the evidentiary strength of the affidavits prior to rendering judgment. As such, we do not agree with J&S's reasoning that the affidavits of Richard Gettelfinger and Mr. Blalock should not have been considered solely because the two individuals were not privy to the oral agreement between Chris Gettelfinger and Mr. Jenkins.

We do determine, however, that non-disclosure of the alleged oral agreement between Chris Gettelfinger and Mr. Jenkins is pertinent in determining whether their agreement was a sufficiently positive and unambiguous indication of the parties' mutual intention to terminate the Lease. Ordinarily, a private conversation between presidents of uninformed companies might not sufficiently convey an "unquestioned purpose to terminate the contract." *See Crye-Leike*, 2004 WL 2636707, at *7. However, the subsequent conduct of the parties in this case also supports a rescission of the Lease near the end of 2011. *See Tidwell*, 840 S.W.2d at 376.

J&S never paid the monthly rent under the terms of the Lease, and TTL never made any demand for payment of rent until November 24, 2015, approximately nine months after the Lease would have contractually terminated. J&S also never took possession of the leased premises. Under the provisions of the Lease, a lack of communication or lack of physical occupancy alone would not necessarily absolve J&S of liability for monthly rent because the Lease set forth no explicit communication or occupancy requirements. Although the parties' cessation of communication and action with respect to the Lease does not *per se* indicate a rescission, we determine that it does sufficiently support J&S's claim that the parties orally rescinded the Lease near the end of 2011 and proceeded to act in a manner consistent with that rescission.

Turning to the question of Chris Gettlefinger's authority to act on behalf of TTL, TTL contends that, pursuant to its Operating Agreement, Chris Gettelfinger required a

19

full vote of TTL's members in order to validly rescind the Lease. TTL further contends through the affidavit of Mr. Blalock that the members of TTL did not grant Chris Gettelfinger authorization through such a vote, allegedly rendering his rescission of the Lease to be an *ultra vires* act. Regarding the powers of the president of TTL, the Operating Agreement provides in pertinent part:

> **Section 8.3. Powers of President.** The President shall have the power and authority on behalf of the Company [to]:
>
> * * *
>
> (c) Execute on behalf of the Company all instruments and documents, including . . . any other instruments or documents necessary in the opinion of the President, to the business of the Company;
>
> * * *
>
> (f) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.
>
> * * *
>
> **Section 8.4. Restrictions on Authority of President.** The President shall not have the authority to, and covenants and agrees that he or she shall not, do any of the following acts without the affirmative vote of the Members holding one hundred percent (100%) of the Governance Rights:
>
> * * *
>
> (b) Sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan so long as such disposition is not in violation of or a cause of a default under any other agreement by which the Company may be bound; provided, however, that the affirmative vote of the Members shall not be required with respect to any sale or distribution of the Company's assets in the aggregate amount of not more than $25,000 in the ordinary course of the Company's business;

* * *

(d)    Cause or permit the Company to engage in activity that is not consistent with the purposes of the Company as set forth in this Agreement;

* * *

(h)    Perform any act that subjects a Member to personal liability.

J&S contends that Chris Gettelfinger did not require a vote from TTL's members because he already possessed authority as president to "do and perform all other acts as may be necessary or appropriate to the conduct of [TTL's] business," which would have included the rescission of an allegedly ineffective Lease. In contrast, TTL argues that Chris Gettelfinger was not authorized to rescind the Lease under the Operating Agreement because (1) "secretly attempting to give away a valuable company asset is nowhere close to 'appropriate' in conducting the business of TTL"; (2) "the alleged oral termination of the Lease [was] against the best interests of TTL"; (3) the Operating Agreement did not authorize the president to sell or distribute TTL's assets worth more than $25,000; and (4) "the alleged act or oral termination of the Lease placed TTL member Mr. Blalock in a position of increased liability." Upon a thorough review of the record, we determine that TTL has not presented sufficient evidence to demonstrate that the Operating Agreement precluded Chris Gettelfinger's authority as president to rescind the Lease on behalf of TTL.

TTL's first point in support of its argument that Chris Gettelfinger committed an *ultra vires* act relies on the language of section 8.3(f) of the Operating Agreement. TTL contends that a rescission of the Lease was not "necessary or appropriate" to TTL's business operations because it was equivalent to a monetary loss in some way. TTL has presented no evidence to support this claim, however, and the respective affidavits of Chris Gettelfinger and Mr. Jenkins contradict TTL's assertions. Specifically, the two affiants both stated that the parties had entered into the Lease for the purpose of obtaining financing for TTL's eventual renovation of the premises and that TTL had then been unable to obtain the contemplated financing. Chris Gettelfinger and Mr. Jenkins also stated that the parties terminated and rescinded the Lease as a result.

We do not agree that the mere rescission of a commercial lease agreement is, *ipso facto*, unnecessary and inappropriate to business operations. "Where the moving party asserts that the nonmoving party's evidence is insufficient as a matter of law, the moving

21

party cannot rely on conclusory statements but must affirmatively show that the required evidence is not in the record." *Jenkins v. Big City Remodeling*, 515 S.W.3d 843, 848 (Tenn. 2017) (citing *Rye*, 477 S.W.3d at 264-65). As a result, we determine that TTL has not presented sufficient evidence to negate J&S's assertion that Chris Gettelfinger had authorization under section 8.3(f) of the Operating Agreement to rescind the Lease on behalf of TTL.

TTL's second point supporting its argument, that a rescission of the Lease was "against the best interests" of TTL, is also not based on any evidence presented to the trial court. We thereby determine that it is insufficient to negate J&S's evidence to the contrary as presented in the affidavits of Chris Gettelfinger and Mr. Jenkins. We also note that TTL has presented no evidence that the Lease constituted "all or substantially all of [TTL's] assets," which would be another condition precluding Chris Gettelfinger's authorization. Additionally, an oral rescission of the Lease is not equivalent to a "sale or distribution of [TTL's] assets," which is a condition that might have similarly prevented Chris Gettelfinger's authorization as president.

The record is unclear as to whether Chris Gettelfinger's potential rescission of the Lease on behalf of TTL could have subjected Mr. Blalock to personal liability. Mr. Blalock made an unspecified reference to personal liability in his affidavit, stating that a rescission of the Lease "put members, including [himself], in danger of personal liability as guarantors of certain loans." In contrast to Mr. Blalock's affidavit, section 3.2 of the Operating Agreement provides that "[t]he Members [of TTL] shall not be liable for the debts, liabilities, contracts or any other obligations of [TTL]" and that "[a] failure to observe any formalities or requirements of this Agreement, the Articles or the Act shall not be grounds for imposing personal liability on the Members for the liabilities of the Company." Furthermore, section XXI(B) of the Lease specifically provides that no member of TTL "shall be personally liable for any obligations or liabilities of Landlord under this Lease."

The wording of the Lease and the structure of TTL as a limited liability company appear to specifically prevent TTL's members from assuming personal liability due to the actions of either TTL or its president. We do not discern sufficient evidence in the record to demonstrate that a rescission of the Lease would have subjected Mr. Blalock or Vol-Kat One, LLC, to personal liability as guarantors of "certain loans." *See Rye*, 477 S.W.3d at 265 ("The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial."). As a result, we determine that TTL has not presented sufficient evidence demonstrating that a rescission of the Lease would have subjected members of TTL to personal liability and thereby precluded Chris Gettelfinger from acting on behalf of TTL.

We conclude that TTL's Operating Agreement may have granted Chris Gettelfinger the authority to rescind the Lease on its behalf as president of TTL under the circumstances described in the affidavits of Chris Gettelfinger and Mr. Jenkins. Therefore, when Chris Gettelfinger met with Mr. Jenkins near the end of 2011, Chris Gettelfinger was potentially able to act on behalf of TTL when expressing his intention to terminate and rescind the Lease. This means that J&S's evidence submitted in response to TTL's motion for summary judgment was sufficient to dispute essential elements of TTL's claim by showing the existence of a potentially valid oral agreement rescinding the Lease. We thereby reverse the trial court's order granting summary judgment in favor of TTL.

## V. J&S's Cross-Motion for Summary Judgment

Although we have determined that TTL failed to present evidence at the summary judgment stage to negate essential elements of J&S's affirmative defense, we do not discern sufficient evidence in the record to further determine that J&S is entitled to summary judgment as a matter of law. Specifically, J&S has shown that Chris Gettelfinger may have had authority to rescind the Lease pursuant to the Operating Agreement, but there is a genuine issue of material fact remaining as to whether Chris Gettelfinger actually possessed that authority near the end of 2011.

We discern two grounds for TTL's contention that an oral rescission of the Lease was not "necessary or appropriate" for conducting business on behalf of TTL: (1) the Lease was a source of significant potential assets for the company, rendering its rescission unnecessary and inappropriate, and (2) the private and informal nature of the oral rescission was inappropriate to the conduct of TTL's business. Chris Gettelfinger's broad grant of authority stems from section 8.3(f) of the Operating Agreement, which allows the president to act "as may be necessary or appropriate to the conduct of the Company's business." Whether Chris Gettelfinger's attempt to orally rescind the Lease was "necessary or appropriate" is therefore a material and potentially dispositive issue.

Neither the termination of the Lease nor the private nature of the oral rescission are sufficient to disprove the affidavits J&S submitted indicating that the oral rescission was necessary and appropriate due to an underlying issue concerning TTL's financing. Considering the evidence in the light most favorable to TTL as the non-moving party on the cross-motion for summary judgment, however, we determine that TTL's allegations with respect to the appropriateness of the oral rescission of the Lease are sufficient to raise a question of genuine material fact. *See Green v. Green*, 293 S.W.3d 493, 514 (Tenn. 2009) (noting that courts reviewing a motion for summary judgment must "consider the evidence in the light most favorable to the non-moving party and draw all

23

reasonable inferences in the non-moving party's favor"). Specifically, the record does not contain sufficient evidence to conclusively demonstrate whether Chris Gettelfinger's oral rescission of the Lease was necessary or appropriate to the conduct of TTL's business.

J&S argues in the alternative that Chris Gettelfinger was able to act on behalf of TTL as its president, pursuant to Tennessee Code Annotated § 48-249-402(d) (2012), because Mr. Jenkins believed that Chris Gettelfinger possessed such authority. The statute provides in pertinent part:

> (d)     AUTHORITY OF OFFICERS.  In a director-managed LLC, or any other LLC with a president, the president is an agent of the LLC for the purpose of its business, and an act of the president, including the signing of an instrument in the LLC's name, that is apparently for carrying on in the ordinary course the LLC's business, or business of the kind carried on by the LLC binds the LLC, unless the president had no authority to act for the LLC in the particular matter, <u>and the person with whom the president was dealing knew or had notice that the president lacked authority</u>. . . .

(Emphasis added.)  In support of J&S's cross-motion for summary judgment, Mr. Jenkins stated in his affidavit that he believed, "both personally and as J&S's president, that Chris Gettelfinger, as TTL's president and chief manager, was authorized to act on TTL's behalf and to bind TTL to the mutual termination and rescission of the Lease."  TTL's only statement to the contrary is that Mr. Jenkins was the secretary of TTL in 2011 and thereby must have been aware of the extent of Chris Gettelfinger's authority as president at that time.

We determine that Mr. Jenkins's former position as secretary of TTL is sufficient evidence to potentially negate his claim that he had no knowledge or notice that Chris Gettelfinger may have lacked the authority to orally rescind the Lease.  We thereby conclude that under the theory of actual authority pursuant to the Operating Agreement or the theory of statutory authority pursuant to Tennessee Code Annotated § 48-249-402(d), a genuine issue of material fact exists as to whether Chris Gettelfinger possessed the authority as president to act on behalf of TTL when attempting to orally rescind the Lease.  As a result, we affirm the trial court's order denying summary judgment in favor of J&S and remand for evidentiary proceedings.

24

## VI. Motion to Alter or Amend Judgment

J&S contends on appeal that the trial court relied on an incorrect standard in its denial of J&S's motion to alter or amend the judgment. As this Court has explained:

> A motion to alter or amend judgment may be granted . . . "(1) when the controlling law changes before a judgment becomes final; (2) when previously unavailable evidence becomes available; or (3) when, for sui generis reasons, a judgment should be amended to correct a clear error of law or to prevent injustice."

*Townsend Sci. Tr. v. Food Tech. Inv'rs, L.P.*, No. W2005-00835-COA-R3-CV, 2006 WL 47433, at *3 (Tenn. Ct. App. Jan. 11, 2006) (quoting *Bradley v. McLeod*, 984 S.W.2d 929, 933 (Tenn. Ct. App. 1998), *overruled in part on other grounds by Harris v. Chern*, 33 S.W.3d 741 (Tenn. 2000)). In its order denying J&S's motion to alter or amend, the trial court stated in relevant part:

> [T]he trial court may grant a motion to alter or amend . . . (1) when the controlling law changes before a judgment becomes final, (2) when previously unavailable evidence becomes available, or (3) when unique circumstances exist.

J&S contends that the trial court was in error "[b]ecause 'unique circumstances' is not a relevant factor in evaluating the propriety of a Rule 59.04 motion." We note, however, that "*sui generis*" is Latin for "of its own kind," indicating something that is "unique or peculiar." *Sui generis*, BLACK'S LAW DICTIONARY (10th ed. 2014). We do not determine that the use of the phrase, "unique circumstances," is so different from "*sui generis* reasons" as to constitute an abuse of discretion. In any case, having determined that the trial court erred by granting summary judgment in favor of TTL, we conclude that the issue of whether the trial court properly considered J&S's motion to alter or amend the judgment is pretermitted as moot.

## VII. Conclusion

For the foregoing reasons, the trial court's grant of summary judgment in favor of TTL is reversed. The trial court's denial of summary judgment to J&S is affirmed. This case is remanded to the trial court, pursuant to applicable law, for evidentiary proceedings consistent with this opinion. Costs on appeal are taxed one-half to the appellant, Jenkins & Stiles, LLC, and one-half to the appellee, Tennessee Traders Landing, LLC.

_____
THOMAS R. FRIERSON, II, JUDGE